Bentley G. Stromberg
CLEMENTS, BROWN & McNICHOLS, P.A.
Attorneys at Law
bstromberg@clbrmc.com
321 13th Street
Post Office Box 1510
Lewiston, Idaho 83501
(208) 743-6538
(208) 746-0753 (Facsimile)
ISB No. 3737

    Attorneys for Defendant Idaho Department of Fish and Game
    Director Virgil Moore, Lucas Swanson, Josh Stanley and
    Brian Johnson

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| STEVE TANNER, | ) |
|     Plaintiff, | ) Case No: 2:18-cv-00456-DCN |
| vs. | ) MEMORANDUM IN |
| | ) OPPOSITION TO PLAINTIFF'S |
| IDAHO DEPARTMENT OF FISH AND | ) MOTION FOR PRELIMINARY |
| GAME DIRECTOR VIRGIL MOORE, | ) INJUNCTION |
| LUCAS SWANSON, JOSH STANLEY, | ) |
| BRIAN JOHNSON; and WILLIE COWELL, | ) |
|     Defendants. | ) |

## I. INTRODUCTION

Plaintiff filed his **verified** Amended Complaint in this Court on November 20, 2018. (Dkt. 4.) The Amended Complaint includes, among other things, a request that this Court issue an order enjoining the Idaho Department of Fish and Game ("IFG") defendants from operating wildlife check stations that require travelers who are not sportsmen to stop. (Dkt. 4, pp. 11-13.)

On January 24, 2019, plaintiff filed a Motion for Declaratroy [sic] Judgement [sic] and Injunctive Relief. (Dkt. 16.) The Motion was filed only nine (9) days after the Court entered its

Litigation Order. (Dkt. 14.) The Motion requested the Court to issue an order "**permanently** enjoining Director Moore and those persons under his official authority from authorizing and operating roadblocks for the purpose of Game Check Stations throughout the State of Idaho." (Dkt. 16 (emphasis added).) On March 26, 2019, this Court issued an Order denying plaintiff's Motion for Declaratory Judgment and Injunctive Relief because "this case is still in its infancy." (Dkt. 27.) The Court noted that it was denying the Motion to "allow the parties time to further develop the record." Id. The reasoning in the Order is addressed specifically to plaintiff's request for a declaratory judgment, but logically extends to and encompasses plaintiff's request for injunctive relief.

On April 4, 2019, plaintiff filed a "Requests [sic] for Clarification of Order" that asks the Court to clarify whether its Order applies to plaintiff's request for injunctive relief. (Dkt. 28.) This Court has yet to rule on plaintiff's request. Nonetheless, on April 29, 2019, plaintiff filed yet another motion for injunctive relief. Plaintiff's Motion for Preliminary Injunction clarifies that plaintiff is seeking a preliminary injunction and requests the Court to "enjoin the Idaho Department of Fish and Game Director Ed Schriever and those persons under his official authority from authorizing and operating roadblocks for the purpose of Game Check Stations throughout the State of Idaho." (Dkt. 30.) Plaintiff's latest motion is premature for the reasons explained in this Court's Order and in the IFG defendants' Memorandum in Support of Motion for Extension of Time. (Dkt. 18.) Plaintiff's latest motion was filed just over one month after this Court denied plaintiff's initial motion as premature. Although plaintiff's latest motion is also premature and should be denied on that basis, the motion also fails on the merits and should be denied for that reason as well.

## II. ARGUMENT

**A.    Standard.**

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that

MEMORANDUM IN OPPOSITION
TO PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION           -2-

the balance of equities tips in his favor, and [4] that an injunction is in the public interest."[1] Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). "[I]njunctive relief is not obtained as a matter of right and it is considered to be an extraordinary remedy that should not be granted unless the movant, **by a clear showing**, carries the burden of persuasion." Rhino Metals, Inc. v. Kodiak Safe Co., LLC, No. 1:16-285-EJL-REB, 2017 WL 2903339, at *12 (D. Idaho 2017) (emphasis added), report and recommendation adopted, No. 116CV00285EJLREB, 2017 WL 2559775 (D. Idaho 2017); see also Cacciaguidi v. Reinke, No. 4:09-CV-343-REB, 2010 WL 3619455, at *1 (D. Idaho 2010) ("Because a preliminary injunction is an extraordinary remedy, the movant's right to relief must be clear and unequivocal."); Easyriders Freedom F.I.G.H.T. v. Hannigan, 92 F.3d 1486, 1500 (9th Cir. 1996) ("[O]ur review of the injunction must be more rigorous when we review an injunction against a state as opposed to a federal agency, since the Supreme Court requires a showing of an **intentional and pervasive pattern of misconduct** in order to enjoin a state agency." (emphasis added)); Dymo Indus., Inc. v. Tapeprinter, Inc., 326 F.2d 141, 143 (9th Cir. 1964) ("The grant of a preliminary injunction is the exercise of a very far reaching power never to be indulged in except in a case clearly warranting it."). Plaintiff has failed to satisfy his burden of clearly showing he is entitled to injunctive relief.

---

[1] The Ninth Circuit has also recognized that "'serious questions going to the merits' and a balance of hardships that tips sharply in favor of the plaintiff can support issuance of a preliminary injunction if there is also a likelihood of irreparable injury and the injunction is in the public interest." Rhino Metals, Inc. v. Kodiak Safe Co., LLC, No. 1:16-285-EJL-REB, 2017 WL 2903339, at *12 (D. Idaho 2017), report and recommendation adopted, No. 116CV00285EJLREB, 2017 WL 2559775 (D. Idaho 2017) (quoting Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1135 (9th Cir. 2011)). "This 'sliding scale approach' allows a party to make a lesser showing of likelihood of success, provided it will suffer substantial harm in the absence of relief. . . . Under this approach, however, 'serious questions going to the merits' requires more than 'success is more likely than not'—it requires a plaintiff to demonstrate a 'substantial case for relief on the merits.'" Rhino Metals, 2017 WL 2903339, at *12. Plaintiff has failed to satisfy both the traditional and alternative standards for granting injunctive relief for the reasons explained below.

**B.     Plaintiff is Not Entitled to a Preliminary Injunction.**

Plaintiff has failed to present any **actual evidence** that would justify issuing a preliminary injunction. Instead, plaintiff has submitted only conclusory, vague, and speculative allegations regarding alleged irreparable harm, his alleged status as a non-sportsman, and the frequency and likely continuation of the wildlife check stations. Plaintiff's conclusory allegations are insufficient to justify issuing a preliminary injunction. See Salazar v. Blades, No. 1:16-CV-00041-REB, 2017 WL 1026419, at *9 (D. Idaho 2017) ("In deciding whether to issue a preliminary injunction, the Court 'is not bound to decide **doubtful** and **difficult** questions of law or disputed questions of fact.'" (quoting Int'l Molders' and Allied Workers' Local Union No. 164 v. Nelson, 799 F.2d 547, 551 (9th Cir. 1986) (emphasis added)).[2] And, the minimal evidence plaintiff has presented actually demonstrates that a preliminary injunction should not be issued.

**1.     No Likelihood of Success on the Merits.**

Plaintiff bases his request for a preliminary injunction on three legal theories: (1) alleged lack of statutory authorization; (2) alleged violation of the Fourth Amendment; and (3) alleged violation of the Idaho Constitution. Plaintiff has failed to **clearly show** that he is likely to succeed on the merits of any of those claims.

**a.     Statutory Authority.**

Plaintiff argues a preliminary injunction should be issued because IFG is allegedly exceeding its statutory authority to conduct wildlife check stations. Plaintiff's argument is based upon Idaho Code section 36-1201, which provides in relevant part:

No fisherman, hunter or trapper shall refuse or fail to:

---

[2] In addition, "[a] court is not obliged to hold a hearing [on a motion for a preliminary injunction] when the movant has not presented a colorable factual basis to support the claim on the merits or the contention of irreparable harm." Salazar, 2017 WL 1026419, at *9 (internal quotations omitted).

. . .

>   (b) Check Stations. Stop and report at a wildlife check station encountered on his route of travel when directed to do so by personnel on duty. Such direction may be accomplished by signs prominently displayed along the route of travel indicating those persons required to stop.

. . .

I.C. § 36-1201. Plaintiff claims IFG is exceeding its statutory authority by stopping all travelers at certain checkpoints, including those who are not fishermen, hunters, or trappers. Plaintiff's argument fails.

Initially, plaintiff's argument is an impractical interpretation of the wildlife check station statute. Except in obvious cases where equipment or wildlife are visible on the outside of travelling vehicles, IFG officers have no effective way to determine which vehicles contain hunters, fishermen, or trappers and which do not without stopping the vehicles. IFG's interpretation of the statute to allow IFG officers to stop all travelers at wildlife check stations is therefore reasonable.[3] People v. Perez, 59 Cal. Rptr. 2d 596, 601 (Ct. App. 1996) ("Government officials may exercise such powers as are necessary to carry out the powers granted by statute or that may be fairly implied from the statute."). In any event, "[l]egislative authorization is not a free-standing constitutional requirement for a reasonable seizure . . . ." State v. Medley, 898 P.2d 1093, 1098 (Idaho 1995); see also V-1 Oil Co. v. Smith, 114 F.3d 854, 857 (9th Cir. 1997) ("[A] violation of a statute or a regulation is not a per se constitutional violation.").

More importantly, plaintiff's limited construction of the statute has been explicitly rejected by the Idaho Court of Appeals. State v. Thurman, 996 P.2d 309, 313 (Idaho Ct. App. 1999). The Court in Thurman specifically held that the Idaho Legislature has authorized IFG to conduct wildlife

---

[3] Plaintiff's argument that the statute applies only to hunters, fishermen, and trappers may have bearing on whether a motorist can be found guilty for violating the statute, but it is not determinative of IFG's authority to stop all motorists. State v. Gascon, 811 P.2d 1103, 1108 (Idaho Ct. App. 1989), aff'd, 812 P.2d 239 (Idaho 1991).

check stations that require all motorists – not just fisherman, hunters, and trappers – to stop. Id. (wildlife check station that required all vehicles that passed to stop and resulted in a total of thirty people being stopped, only sixteen of whom were hunters, was authorized by Idaho Code sections 36-1201 and 36-103(b)[4]). Plaintiff's reliance on State v. Henderson, 756 P.2d 1057, 1061 (Idaho 1988), which addressed the lack of legislative authority for law enforcement to conduct DUI checkpoints, is therefore misplaced. Medley, 898 P.2d at 1099 (1995) ("*Henderson* . . . expressed no view as to whether fish and game roadblocks complied with state constitutional requirements."). Plaintiff's arguments regarding Idaho Code section 19-621, which addresses general law enforcement roadblocks, and section 19-622, which addresses the requirements for those roadblocks when circumstances allow, are similarly irrelevant.

In light of Thurman, plaintiff cannot succeed on the merits of his claim that IFG does not have statutory authority to conduct wildlife check stations that require "non-sportsmen" to stop. The Idaho Legislature has vested IFG with abundant authority to enforce Idaho's fish and game laws and to implement programs and policies that enable IFG to effectively do so. I.C. § 36-106(e)(1) ("The director shall have general supervision and control of all activities, functions, and employees of the department of fish and game, . . . and shall enforce all the provisions of the laws of the state, and

---

[4] Idaho Code section 36-103(b) provides:

> (b) Commission to Administer Policy. Because conditions are changing and in changing affect the preservation, protection, and perpetuation of Idaho wildlife, the methods and means of administering and carrying out the state's policy must be flexible and dependent on the ascertainment of facts which from time to time exist and fix the needs for regulation and control of fishing, hunting, trapping, and other activity relating to wildlife, and because it is inconvenient and impractical for the legislature of the state of Idaho to administer such policy, it shall be the authority, power and duty of the fish and game commission to administer and carry out the policy of the state in accordance with the provisions of the Idaho fish and game code. The commission is not authorized to change such policy but only to administer it.

rules and proclamations of the commission relating to wild animals, birds, and fish . . . and shall exercise all necessary powers incident thereto not specifically conferred on the commission."); I.C. § 36-106(e)(2) ("The director is hereby authorized to appoint as many classified employees as the commission may deem necessary . . . to enforce the laws and to properly implement management, propagation, and protection programs established for carrying out the purposes of the Idaho fish and game code."); I.C. § 36-1301(1) ("The director, all conservation officers and other classified department employees . . . shall have statewide jurisdiction and it is hereby made their duty to enforce the provisions of the Idaho fish and game code."); I.C. § 67-2405(1)(a) & (b) ("Unless specifically provided otherwise, each department head shall: (a) Supervise, direct, account for, organize, plan, administer and execute the functions vested within the department as provided by law[; and] (b) Establish policy to be followed by the department and its employees."). Plaintiff's request that a preliminary injunction be issued based upon the alleged lack of statutory authority should therefore be denied.

    **b.**  **Fourth Amendment.**

Plaintiff also contends IFG's wildlife check stations violate the Fourth Amendment. Plaintiff argues the check stations are invalid because their sole purpose is allegedly to detect evidence of ordinary criminal wrongdoing. Plaintiff has failed to make a **clear showing** that he is likely to succeed on the merits of his Fourth Amendment claim. Westgard v. Kennard, No. 117CV00239JMSTAB, 2017 WL 2971959, at *7 (S.D. Ind. 2017) ("In order to succeed on the merits, [plaintiff] bears the burden of establishing that the challenged activity constitutes a search barred by the Fourth Amendment. And he bears the burden at the preliminary injunction phase of establishing a likelihood of success on the merits.").

"There is a two-step analysis applicable to Fourth Amendment checkpoint cases." U.S. v. Fraire, 575 F.3d 929, 932 (9th Cir. 2009). "First, the court must determine whether the primary

purpose of the [checkpoint] was to advance the general interest in crime control." Id. (internal quotations omitted). "If so, then the stop . . . is per se invalid under the Fourth Amendment." Id. (quoting U.S. v. Faulkner, 450 F.3d 466, 470 (9th Cir. 2006)).

Second, "[i]f the checkpoint is not per se invalid as a crime control device, then the court must 'judge [the checkpoint's] reasonableness, hence, its constitutionality, on the basis of the individual circumstances.'" Fraire, 575 F.3d at 932 (quoting Illinois v. Lidster, 540 U.S. 419, 426 (2004)). This second step "requires consideration of '[1] the gravity of the public concerns served by the seizure, [2] the degree to which the seizure advances the public interest, and [3] the severity of the interference with individual liberty.'" Fraire, 575 F.3d at 932 (quoting Lidster, 540 U.S. at 426).

Here, IFG's wildlife check stations comply with the Fourth Amendment because the primary purpose of the check stations is not the advancement of a general interest in crime control and the check stations are otherwise reasonable.

### i.   Primary Purpose of Wildlife Check Stations.

The primary purpose of IFG wildlife check stations is not general crime control. Plaintiff's own evidence shows that the purpose of the check stations is "[t]o effectively manage the state's wildlife resources" by allowing IFG to: "1. Make field contacts with anglers, hunters, and trappers to collect biological and harvest data to support evaluation and development of wildlife management plans and programs; 2. Receive public input for future management planning; [and] 3. Enforce state laws and commission seasons and rules as they pertain to the management and conservation of state wildlife resources." (Dkt. 30-2, p. 1.) IFG's policy requires each check station to be conducted "in the spirit of wildlife conservation and long-term management objectives, in a manner that minimizes intrusion and delay for sportsmen and the general public." Id. at p. 3. Federal and local law enforcement officials may participate in the check stations only if there is a "demonstrated need"

and, even then, only "to assist with non-title 36 violations [Fish and Game] inadvertently encountered or detected while obtaining management data and checking for Title 36 compliance." Id. IFG officers conducting wildlife check stations may not allow or assist federal or local law enforcement officers "to routinely conduct non-Title 36 compliance checks . . . without direct association with the investigation of a wildlife violation or an obvious plain view or inadvertently detected violation or public safety issue." Id. Plaintiff has presented absolutely no evidence – let alone made a **clear showing** – that the wildlife check stations he is challenging failed to comply with the foregoing policies.

The wildlife check stations plaintiff is challenging are unlike the "dragnet" checkpoint that was held invalid in the case plaintiff relies upon, State v. Medley, 898 P.2d 1093 (Idaho 1995). The IFG officer in charge of the checkpoint in Medley "issued a blanket invitation to any additional law enforcement agency that wished to participate so that violations of laws not pertaining to fish and game could be detected and dealt with." Id. at 1098. In response to that invitation, numerous law enforcement agencies, including the County Sheriff's Office, U.S. Border Patrol, U.S. Fish and Wildlife Service, County Law Enforcement Auxiliary, and County Interagency Drug Task Force, all "played an active role in the operation." Id. And, after the IFG officers in Medley completed their inquiry with passengers of stopped vehicles, officers from the other law enforcement agencies questioned the passengers about potential legal violations unrelated to fish and game. Id. Plaintiff has made absolutely no showing that the wildlife check stations he is challenging were operated in a manner even remotely similar to the checkpoint involved in Medley. Plaintiff's own complaint acknowledges that local law enforcement did not become involved in the IFG operation on November 18, 2017 that is the primary subject of plaintiff's claims until plaintiff evaded the IFG check station and refused to pull over for IFG officers for over 1.5 miles. (Dkt. 4 at ¶¶11, 13, 14, 19, & 26.)

Plaintiff has not made a **clear showing** that IFG's wildlife check stations are administered for the primary purpose of general crime control. See Fraire, 575 F.3d at 933 ("That the checkpoint accomplished this goal [of minimizing illegal animal takings] through the use of law enforcement techniques does not automatically transform it into a crime control device for Fourth Amendment purposes."); Faulkner, 450 F.3d at 471 ("While one of the information station's purposes may have been to advance a general interest in crime control, it was not the *primary* purpose. Indeed, 'the phrase 'general interest in crime control' does not refer to every 'law enforcement' objective.'" (quoting Lidster, 540 U.S. at 424)). Accordingly, the check stations do not constitute a per se violation of the Fourth Amendment. The check stations are instead reasonable, and thus constitutional, for the reasons explained below.

      **ii.**    **The Wildlife Check Stations are Reasonable.**

          **a.**    **Gravity of Public Concern.**

IFG's wildlife check stations satisfy the Fourth Amendment's reasonableness requirement. Initially, "the gravity of the public concerns served by the [check stations]" is great. Fraire, 575 F.3d at 932. Idaho "has a compelling interest in the management and conservation of its natural resources, including wildlife." Medley, 898 P.2d at 1097; see also State v. Albaugh, 571 N.W.2d 345, 347-48 (N.D. 1997) ("[T]he State has a compelling interest in managing and preserving its wildlife."); Perez, 59 Cal. Rptr. 2d at 600 ("The state has a great and legitimate interest in the preservation and management of its natural resources, including wildlife."). Wildlife conservation is of such importance that the Idaho "legislature has asserted pervasive control over it." Medley, 898 P.2d at 1097; see also I.C. § 36-103(a) ("All wildlife, including all wild animals, wild birds, and fish, within the state of Idaho, is hereby declared to be the property of the state of Idaho. It shall be preserved, protected, perpetuated, and managed. It shall be only captured or taken at such times or places, under such conditions, or by such means, or in such manner, as will preserve, protect, and

MEMORANDUM IN OPPOSITION
TO PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION        -10-

perpetuate such wildlife, and provide for the citizens of this state and, as by law permitted to others, continued supplies of such wildlife for hunting, fishing and trapping."). "[F]ish and game violations are matters of grave public concern which justify minimal intrusion into the public's right of privacy." Medley, 898 P.2d at 1097.

### b.    Advancement of the Public Interest.

The wildlife check stations substantially advance the public's interest in wildlife conservation and management. Albaugh, 571 N.W.2d at 348 ("[C]heckpoints are often the least restrictive means of effectively enforcing the game-and-fish laws."). "*Routine* fish and game check stations are indeed an effective method for advancing [the public's interest in conservation and management of wildlife resources]." Medley, 898 P.2d at 1097; see also Thurman, 996 P.2d 309, 314. Idaho is an expansive and remote state and "[r]equiring conservation officers, under these circumstances, to have probable cause before stopping suspected violators would be an enormous burden." Medley, 898 P.2d at 1097-98; see also Albaugh, 571 N.W.2d at 348 ("Game wardens surely face a daunting task when attempting to enforce the game laws in a rural region like North Dakota. In assessing the need for checkpoints to do so, courts have stressed the limited manpower available to game officials, the vast and remote areas where hunting usually occurs, and the difficulty in detecting game violations without suspicionless stops."); State v. Tourtillott, 618 P.2d 423, 430 (Or. 1980), cert. denied, 451 U.S. 972 (1981) (game checkpoint where all vehicles were required to stop or slow was "one of the most effective" mechanisms to meet the state's goals relating to wildlife conservation in light of the expansive territory of the state, which made fish and game enforcement difficult); State v. Halverson, 277 N.W.2d 723, 724 (S.D. 1979) (similar); State v. Sherburne, 571 A.2d 1181, 1184-85 (Me. 1990) (similar).

Plaintiff has presented absolutely no evidence that the wildlife check stations he is challenging were anything other than routine check stations administered to further the public's

interest in wildlife conservation and management. To the contrary, plaintiff's own Amended Complaint and his Declaration confirm that all southbound traffic was required to stop at the check stations, the check stations were set up at the same location, plaintiff has frequently encountered the check stations, and plaintiff himself characterizes the check stations as "routine." (Dkt. 4 ¶¶ 8, 9, 11, & 43-46; Dkt. 30-3 ¶¶ 3, 8, 9, & 55); see also Thurman, 996 P.2d 309, 314 (wildlife check station set up in the same location during hunting season that required every vehicle travelling from one direction to stop was "a routine check station meant to collect data, speedily interact with the public, and detect fish and game violations"). Plaintiff's own evidence shows the wildlife check stations are routine check stations designed to advance the public interest in wildlife preservation and management.

### c.    Minimal Interference with Individual Liberty.

Finally, the severity of the interference with individual liberty resulting from the wildlife check stations is minimal. "This factor is 'gauged by the objective intrusion, measured by the duration of the seizure and the intensity of the investigation, and by the subjective intrusion, measured by the fear and surprise engendered in law-abiding motorists by the nature of the stop.'" Fraire, 575 F.3d at 934 (quoting Faulkner, 450 F.3d at 473). Here, there is no evidence before the Court that the wildlife check stations were either objectively or subjectively unreasonable.

The evidence instead shows that the wildlife check stations were conducted in an objectively reasonable manner. IFG's wildlife check station policy requires check station operations to be conducted in a manner that "will minimize delay and inconvenience to motorists and sportsmen . . . ." (Dkt. 30-2, p. 1.) The policy also requires supervisor approval prior to implementing any check

MEMORANDUM IN OPPOSITION
TO PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION                -12-

station. Id. at p. 2. Plaintiff has not presented any evidence that these policies were not followed.[5] Nor has plaintiff presented any evidence that the stops conducted at the wildlife check stations were objectively unreasonable as to scope, duration, or any other matter. The check stations are conducted in a systematic, non-intrusive manner and require non-sportsmen to stop for only approximately 15 seconds. (Stanley Dec. ¶7.) Hunters are stopped only for the time necessary to verify their hunting licenses and inspect any harvested animals to ensure they are properly tagged. Id. The check stations are thus objectively reasonable.

The evidence also shows the wildlife check stations were administered in a subjectively reasonable manner. IFG policy requires all check stations be located in positions that allow for safe motor vehicle operation and be posted with warning signs. (Dkt. 30-2, pp. 2-3.) And, plaintiff's own evidence shows that the wildlife check stations were operated at a fixed location, all vehicles travelling in one direction were required to stop at the check stations, the IFG officers plaintiff encountered were in a patrol vehicle, and plaintiff was aware the IFG officers were conducting wildlife check stations. (Dkt. 4 ¶¶8, 13 & 14; Dkt. 30-3 ¶3); see also Drane v. State, 493 So. 2d 294, 296 (Miss. 1986), cert. denied, 482 U.S. 916 (1987) ("[S]tops at fixed, identifiable road blocks have been held less intrusive for Fourth Amendment purposes than stops by roving police units."); State v. Albaugh, 571 N.W.2d at 349 (psychological intrusion on vehicle occupants is minimized when all vehicles are required to stop at a checkpoint as opposed to when officers have discretion to select vehicles to stop); Tourtillott, 618 P.2d at 429-30 & 433 (game checkpoint was constitutional where

---

[5] However, even if he had, the failure to follow such policies would not automatically render the check stations unconstitutional. Thurman, 996 P.2d at 313 ("We are unable to ascertain whether Officer Day complied with all of the other applicable IDFG guidelines because there is no evidence in the record on this matter. However, even if there existed proof that Officer Day did not fully comply with all internal guidelines, such fact alone would not support a conclusion that the stop was unconstitutional. It is only pertinent to our inquiry that Officer Day acted reasonably and without any significant exercise of individual discretion.").

all vehicles were required to stop or slow at checkpoint, thereby decreasing the degree of any psychological and physical intrusion, particularly since "one's expectation of privacy in an automobile and of freedom in its operation are significantly different from the traditional expectation of privacy and freedom in one's residence." (quoting U.S. v. Martinez-Fuerte, 428 U.S. 543, 556 (1976))); Halverson, 277 N.W.2d at 725 ("The checkpoint in this case was not permanent, but it did not have all the evils of a roving patrol since there were several identifiable state vehicles at the checkpoint with presumably uniformed officers attending. There were adequate visible signs of who was making the stop. This type of stop should not frighten or greatly concern a normal motorist."); Faulkner, 450 F.3d at 473 ("[W]e view checkpoint stops in a different light [than other seizures] because the subjective intrusion [—] the generating of concern or even fright on the part of lawful travelers [—] is appreciably less in the case of a checkpoint stop." (quoting Martinez–Fuerte, 428 U.S. at 558)); Delaware v. Prouse, 440 U.S. 648, 657 (1979) ("For Fourth Amendment purposes, we also see insufficient resemblance between sporadic and random stops of individual vehicles making their way through city traffic and those stops occasioned by roadblocks where all vehicles are brought to a halt or to a near halt, and all are subjected to a show of the police power of the community. 'At traffic checkpoints the motorist can see that other vehicles are being stopped, he can see visible signs of the officers' authority, and he is much less likely to be frightened or annoyed by the intrusion.'"). IFG's evidence further shows that, with respect to the check station conducted on November 18, 2017 that is the primary subject of plaintiff's claims, all officers present were dressed in full uniform, all traffic travelling on Meadow Creek Road towards Bonner's Ferry was required to stop at the check station, and the IFG officers who conducted the check station set up two warning signs for the check station and a stop sign at the check station in accordance with IFG policy. (Dec. Counsel, Exh. A.)

        In light of the foregoing, the evidence before the Court shows that the minimal interference

with individual liberty resulting from the wildlife check stations is reasonable, both objectively and subjectively.

### d. Weight of Factors Relevant to Reasonableness.

The foregoing factors relating to the reasonableness of the wildlife check stations all demonstrate that the check stations are constitutionally reasonable. Tourtillott, 618 P.2d at 430 ("We conclude that the governmental interest in the enforcement of laws for the preservation of wildlife in this state is sufficiently substantial to justify the minimal intrusion upon the Fourth Amendment rights of those stopped for brief questioning and a visual inspection of their vehicles."); Halverson, 277 N.W.2d at 725 (in the context of game checkpoint vehicle stops "[t]he intrusion into the right of the non-hunter to the uninterrupted use of the highways is slight and greatly outweighed by the public interest in the management and conservation of wildlife in this state"); see also Prouse, 440 U.S. at 663 ("This holding does not preclude . . . States from developing methods for spot checks that involve less intrusion or that do not involve the unconstrained exercise of discretion. Questioning of all oncoming traffic at roadblock-type stops is one possible alternative."); and Prouse, 440 U.S. at 663-64 (Blackmun and Powell, JJ. concurring) ("The Court . . . carefully protects from the reach of its decision other less intrusive spot checks 'that do not involve the unconstrained exercise of discretion.' The roadblock stop for all traffic is given as an example. . . . I would not regard the present case as a precedent that throws any constitutional shadow upon the necessarily somewhat individualized and perhaps largely random examinations by game wardens in the performance of their duties. In a situation of that type, it seems to me, the Court's balancing process, and the value factors under consideration, would be quite different."). Plaintiff has failed to **clearly show** that the check stations violate the Fourth Amendment. Plaintiff consequently has not satisfied his burden of demonstrating he is likely to succeed on the merits of his Fourth Amendment claim. As such, plaintiff's request that a preliminary injunction be issued on that basis should be denied.

### c.     Idaho Constitution Article I, § 17.

Plaintiff alternatively argues that a preliminary injunction should be issued based upon Article I, § 17 of the Idaho Constitution, which plaintiff contends affords greater protection in the context of wildlife check stations than the Fourth Amendment.  Plaintiff's request for a preliminary injunction on this basis should be denied because plaintiff cannot clearly show that he is likely to succeed on the merits of his state constitutional claim.

The Idaho Court of Appeals in Thurman explicitly rejected plaintiff's argument and concluded that the Idaho Constitution does not afford greater protection than the Fourth Amendment when it comes to wildlife check stations.  Thurman, 996 P.2d at 316.  Thurman, discussed above, is the case that involved an IFG wildlife check station that required travelers who were not fisherman, hunters, or trappers to stop.  Id.  Accordingly, plaintiff is unlikely to succeed on his claim that IFG's wildlife check stations violate the Idaho Constitution and his motion for a preliminary injunction based upon this claim should be denied.

### 2.     No Likelihood of Irreparable Harm.

Admittedly, the deprivation of a constitutional right constitutes an irreparable injury for purposes of the preliminary injunction analysis.  Melendres v. Arpaio, 695 F.3d 990, 1002 (9th Cir. 2012).  However, plaintiff has not made a **clear showing** that his, or anyone else's, constitutional rights were, or in the future will be, violated and thereby result in irreparable harm.  Plaintiff has presented no actual evidence as to the frequency the check stations are operated or, more importantly, that the check stations were or will be operated in any unlawful manner that will cause irreparable harm. (Dkt. 30-3, ¶¶1, 4.) Plaintiff only speculates that, "[u]pon information and belief, the IDF&G will again establish game check stations stopping all traffic in one or both directions on Meadow Creek Road and/or other locations within the State of Idaho."  (Dkt. 30-3 ¶15.)  A preliminary injunction may not be issued upon such vague, conclusory, and speculative allegations.

Caribbean Marine Servs. Co. v. Baldrige, 844 F.2d 668, 674 (9th Cir. 1988) ("At a minimum, a plaintiff seeking preliminary injunctive relief must demonstrate that it will be exposed to irreparable harm. . . . Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction."); Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1131 (9th Cir. 2011) ("[P]laintiffs must establish that irreparable harm is *likely,* not just possible, in order to obtain a preliminary injunction."). Accordingly, this factor also weighs against granting plaintiff's request for a preliminary injunction. Native Ecosystems Council & All. for the Wild Rockies v. U.S. Forest Servs. ex rel. Davey, No. 4:11-CV-00212-CWD, 2011 WL 4015662, at *7 (D. Idaho 2011) ("Where a plaintiff fails to demonstrate a likelihood of irreparable harm in the absence of preliminary relief, the court need not address the remaining elements of the preliminary injunction standard.").

### 3. Balance of the Equities.

This factor also warrants denial of plaintiff's request for a preliminary injunction for the reasons explained above in the analysis regarding the balancing of the public interest against the minimal intrusion on personal privacy.

### 4. Public Interest.

This factor also favors denying plaintiff's request that a preliminary injunction be issued for the reasons explained above in the analysis regarding the balancing of the public interest against the minimal intrusion on personal privacy. Plaintiff's broad request that the Court enjoin IFG from "operating roadblocks for the purpose of Game Check Stations **throughout the State of Idaho**" would not serve the public's interest in wildlife conservation and management. (Dkt. 30 (emphasis added).) Plaintiff's requested injunction would actually disserve the public interest because plaintiff has failed to show that the wildlife check stations he has encountered – let alone all wildlife check stations in the State of Idaho – have been, or will be, operated contrary to IFG policy, state law, or the state or federal constitutions. The handful of occasions upon which plaintiff has encountered

lawful wildlife check stations near his residence do not justify granting an injunction that would stifle wildlife management and conservation efforts throughout the State of Idaho.

### III. CONCLUSION

For the foregoing reasons, plaintiff's Motion for Preliminary Injunction should be denied.

DATED this 20th day of May 2019.

        CLEMENTS, BROWN & McNICHOLS, P.A.

        By   /s/  Bentley G. Stromberg
            BENTLEY G. STROMBERG
            Attorneys for Defendants

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 20th day of May 2019, I filed the foregoing electronically through the CM/ECF system; AND I FURTHER CERTIFY that on such date, I served the foregoing on the following non-CM/ECF Registered Participant in the manner indicated:

>Peter C. Erbland
>perbland@lclattorneys.com
>Jennifer Fegert
>jfegert@lclattorneys.com
>Lake City Law Group, PLLC
>435 W. Hanley Avenue, Suite 101
>Coeur d'Alene, ID  83815
>
>Steve Tanner, Pro Se
>P. O. Box 613
>Bonners Ferry, Idaho  83805
>steveatanner@gmail.com
>
>____X____ U.S. MAIL
>_____ HAND DELIVERED
>_____ OVERNIGHT MAIL
>_____ TELECOPY (FAX)
>____X____ E-MAIL

>_____/s/    Bentley G. Stromberg__
>Bentley G. Stromberg