UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| STEVE TANNER<br><br>Petitioner,<br><br>v.<br><br>IDAHO DEPARTMENT OF FISH AND GAME DIRECTOR VIRGIL MOORE, LUCAS SWANSON, JOSH STANLEY, BRIAN JOHNSON; and WILLIE COWELL<br><br>Respondent. | Case No. 2:18-cv-00456-DCN<br><br>**ORDER** |

## I. INTRODUCTION

Pending before the Court is Plaintiff Steve Tanner's Motion for Preliminary Injunction. Dkt. 30. Having reviewed the record and briefs, the Court finds that the facts and legal arguments are adequately presented. Accordingly, in the interest of avoiding further delay, and because the Court finds that the decisional process would not be significantly aided by oral argument, the Court will decide the Motion without oral argument. Dist. Idaho Loc. Civ. R. 7.1(d)(1)(B).

## II. BACKGROUND

Idaho Fish and Game ("IFG"), a government agency, utilizes wildlife check stations to manage Idaho's wildlife resources. At these wildlife check stations IFG officers stop all vehicles passing through and inquire if the driver and/or passengers have been hunting, fishing, or trapping. If the answer is no, the officers ask no further questions and the vehicle

proceeds on its way. These stops are rarely longer than a few seconds. If the answer is yes, the officers spend a few minutes collecting data, receiving public input, and, if necessary, enforcing state laws that pertain to the management and conservation of wildlife resources.

In the early evening of November 18, 2017, Tanner was traveling southbound on Meadow Creek Road, located in Boundary County. At that time, Defendants Lucas Swanson, Josh Stanley, and Brian Johnson, employees of IFG, were operating a wildlife check station on Meadow Creek Road. As Tanner arrived at this station, he proceeded around it without stopping. Defendants Swanson and Stanley pursued Tanner in their patrol vehicle and arrested him for failing to stop at the check station.

Tanner originally filed suit on September 24, 2018, in Idaho state court. On October 17, 2018, defendant Willie Cowell removed the case to this Court pursuant to 28 U.S.C. §§ 1331, 1441(b), and 1446(b).

Tanner now seeks a preliminary injunction enjoining the IFG from utilizing wildlife check stations during the pendency of this litigation.

### III. LEGAL STANDARD

Plaintiffs seeking a preliminary injunction must establish that: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Short v. Brown*, 893 F.3d 671, 675 (9th Cir. 2018) (internal citations omitted). The basic function of a preliminary injunction is to "preserve the status quo ante litem pending a determination of the action on the merits." *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1200 (9th Cir. 1980). A preliminary

injunction should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Towery v. Brewer*, 672 F.3d 650, 657 (9th Cir. 2012) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). The Court will address each of the necessary elements for a preliminary injunction in turn.

## IV. ANALYSIS

In relevant part, Idaho Code § 36-1201 ("§ 1201") states that "[n]o fisherman, hunter or trapper shall refuse or fail to . . . [s]top and report at a wildlife check station encountered on his route of travel when directed to do so by personnel on duty." Idaho Code § 36-1201. Tanner challenges § 1201's constitutionality, contesting that, as applied, § 1201 violates the Fourth Amendment and its state counterpart–Article I, Section 17 of the Idaho Constitution. Tanner argues that the plain language of § 1201 does not give IFG authority to stop citizens such as himself who are not fishermen, hunters, or trappers. As such, he believes that an unreasonable seizure occurs whenever IFG stops one of these "non-sportsmen" citizens at a wildlife check station.

1. **Likelihood of Success on the Merits**

"The Fourth Amendment applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest." *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975). "[S]topping an automobile and detaining its occupants constitute a 'seizure' within the meaning of [the Fourth] Amendment[], even though the purpose of the stop is limited and the resulting detention quite brief." *Delaware v. Prouse*, 440 U.S. 648, 654 (1979). Thus, checkpoint station stops, such as the wildlife check station here, constitute a seizure under the Fourth Amendment.

MEMORANDUM DECISION AND ORDER – 3

However, not every seizure violates the Fourth Amendment: only unreasonable seizures do so. "There is a two-step analysis applicable to Fourth Amendment checkpoint cases. First, the court must determine whether the primary purpose of the checkpoint was to advance the general interest in crime control. If so, then the stop is . . . per se invalid." *United States v. Fraire*, 575 F.3d 929, 932 (9th Cir. 2009).

Here, the primary purpose of the wildlife check stations is likely not crime control.[1] In a policy statement, IFG states the purpose of the wildlife check stations is to "effectively manage the state's wildlife resources" by making field contacts with sportsmen, collecting biological and harvest data to support wildlife management plans, receiving public input, and enforcing state laws and rules. Dkt. 30–2, at 1. Though the wildlife check stations may certainly lead to enforcement of criminal statutes, "the use of law enforcement techniques does not automatically transform [them] into a crime control device for Fourth Amendment purposes." *Fraire*, 575 F.3d at 932. There is compelling legal authority that the primary purpose of these wildlife check stations is narrowly focused to advance the public's interest in wildlife preservation and management, not to control crime, and thus they are not per se unconstitutional. *See id.* (holding a similar type of checkpoint station was not unconstitutional); *see also State v. Thurman*, 996 P.2d 309, 316 (Idaho 1999) (same).

Because the wildlife check station stops are likely not per se unconstitutional, the Court would need to next "judge the checkpoint's reasonableness, hence, its constitutionality, on the basis of the individual circumstances." *Fraire,* 575 U.S. at 932.

---

[1] Nowhere in Tanner's briefing does he argue that the purpose of wildlife check stations is crime control.

Tanner argues that the wildlife check stations cannot be reasonable because requiring "non-sportsmen" to stop exceeds the powers § 1201 gives to IFG. IFG counters that the most practical way to implement § 1201 is to stop all vehicles and inquire if the passengers are hunters, fishers, or trappers. Otherwise, they reason, there is "no effective way to determine which vehicles contain hunters, fishermen, or trappers and which do not." Dkt. 31, at 5.

If a seizure is not made pursuant to a warrant, probable cause, or any warrant exception, "[t]he reasonableness of [the] seizure[] . . . depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." *Brown v. Texas*, 443 U.S. 47, 50 (1979) (internal quotations and citations omitted). "Consideration of the constitutionality of such seizures involves a weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." *Id.* at 50–51.

    a. The Public Interest Involved

Idaho has a compelling interest in the management and conservation of its natural resources, including wildlife. This interest is not only codified in Idaho Code § 36-103, but has also been acknowledged by the Idaho Supreme Court. *See Thurman*, 996 P.2d at 314 ("[F]ish and game violations are matters of grave public concern which justify minimal intrusion into the public's right of privacy.") (quoting *State v. Medley*, 898 P.2d 1093, 1097 (Idaho 1995)).

    b. The Degree to Which the Seizure Advances the Public Interest

The Idaho Supreme Court has stated "*Routine* fish and game check stations are

indeed an effective method for advancing this interest. . . . Requiring conservation officers, under these circumstances, to have probable cause before stopping suspected violators would be an enormous burden." *Id.* at 1097–98. The Court agrees with both this conclusion and its reasoning. These routine check stations are designed to quickly and efficiently gather the necessary information to maintain and protect Idaho's wildlife. Thus, the quick stops at the wildlife check stations effectively advance the public's interest in wildlife conservation.

   c. *The Severity of the Interference with Individual Liberty*

This factor is broken up into two subparts—an objective part and a subjective part. *Fraire*, 575 F. 3d at 934. The objective part focuses on the "duration of the seizure and the intensity of the investigation." *Id.* Here, the duration of each stop varies from a few seconds—if the passengers have not engaged in hunting, fishing, or trapping—to several minutes—if the passengers have engaged in such activities. The short duration of these stops matches the minimal nature of any accompanying investigation; an IFG officer asks simply if any passengers have been hunting, fishing, or trapping. Depending on the answer, the officer either sends them on their way without any further questions or follows up with a few more questions and some investigation.

In this case there technically was no seizure because Tanner bypassed the wildlife check station.[2] Had he stopped, however, the severity of the seizure likely would have been

---

[2] This raises a potentially issue as to Tanner's standing in this case. In his motion, Tanner states that he "has been repeatedly confronted over the years with these roadblocks," Dkt. 30–1, at 6, but does not state, either in his Complaint or this motion, that he has ever stopped at one of these roadblocks. Tanner does allege, however, that he was arrested for failing to stop at the Meadow Creek Road check station. Based on this

minimal. Tanner is not a hunter, fisher, or trapper, and was not engaged in such activities that day. This means that if he had stopped at this station, all that was required was for him to answer the officer's first question in the negative and he would be on his way. It is hard to imagine a seizure of shorter duration or an investigation less intense than this.

The second part of this factor focuses on the subjective nature of the seizure. "The severity of the subjective intrusion is measured by the amount of concern and fright that is generated on the part of lawful travelers." *Id.* As a general matter, "[t]he subjective intrusion from a checkpoint stop is significantly less than other types of seizures, such as random stops." *Id.*

Here, Tanner makes no arguments concerning the subjective severity of the seizure. In his Complaint, however, he states that this wildlife check station was operated in the dark on a sharply curved section of Meadow Creek Road and that there were no warning signs or lights of any kind to alert travelers to the existence of the checkpoint.[3] Defendants deny these allegations and provide evidence that the game check in questions was properly equipped with lights and other safety features.

If Tanner's allegations are true, such a wildlife check station would reasonably cause anxiety or alarm because unsuspecting travelers would be expected to stop abruptly

---

and for purposes of this motion, the Court assumes without deciding that Tanner has standing to bring his claims.

[3] Based on these assertions, it appears Tanner is making a separate "as-applied" challenge to § 1201 due to the unsafe manner which this particular wildlife check station was operated. As Tanner makes clear in his briefing for the current motion, though, "Tanner does not herein challenge how the game check station roadblocks were set up, but the fact that the [IFG] roadblocks exist." Accordingly, the Court does not consider these assertions as a separate constitutional attack, but only as evidence of the severity of this wildlife check station's subjective intrusion.

without warning. This unexpected anxiety and alarm would certainly increase the subjective severity of IFG's intrusion. At this juncture, though, the Court is not required to accept Tanner's allegations as true. As this is Tanner's Motion for a Preliminary Injunction, he bears the burden of persuasion. *Towery*, 672 F.3d at 657. Tanner failed to present any argument regarding the concern or fright he experienced as a result of this wildlife check station in his motion and has not put forth any evidence supporting the relevant allegations contained in the Complaint. Thus, the Court does not consider his allegations here.

All in all, the game check station's interference with individual liberty is likely very minimal. Objectively, the duration and intensity of the station's seizures are nominal, and Tanner has not argued that subjectively they were any more severe.

   d. *Evaluating the Likelihood of Success on the Merits*

In considering these three factors, the Court determines that Tanner has failed to show a likelihood of success on the merits and this factor weighs against a preliminary injunction. Tanner is correct in arguing that § 1201 requires IFG officers to make a Fourth Amendment "seizure," but a seizure alone is not enough to deem it unconstitutional. To be unconstitutional, a seizure must also be unreasonable. Because the seizure was likely reasonable in this case, Tanner is unlikely to succeed in his arguments that IFG violated his Fourth Amendment rights.

   e. *The Idaho Constitution*

In addition to the Fourth Amendment, Tanner alleges the wildlife check stations

violate Article I, Section 17 of the Idaho Constitution.[4] For this assertion he relies on the same facts he alleged in support of his Fourth Amendment argument.

"It is well settled that Idaho courts are free to interpret provisions of the Idaho Constitution to provide greater protection than their corresponding provisions of the United States Constitution." *Thurman*, 996 P.2d at 315–16. The *Thurman* court was presented with the very same issue as here. There, the plaintiff had proceeded past an IFG wildlife check station and was subsequently stopped and cited for possession of an illegally taken doe and fawn, and failure to stop at the check station. *Id.* at 312. The plaintiff argued that the IFG wildlife check station violated the Fourth Amendment and Article I, Section 17 of the Idaho Constitution. Applying the same analysis as above, the *Thurman* court determined that the wildlife check station did not violate the Fourth Amendment. Further, the court found "no reason to announce that our state Constitution provides greater protection to the hunting public in this situation than does the Fourth Amendment to the United States Constitution." *Id.* at 316.

Based on this precedent, the Court finds it unlikely that IFG's wildlife check stations violate the Idaho Constitution. Thus, for the same reasons Tanner is unlikely to succeed in his arguments that IFG violated his rights under the U.S. Constitution, he is unlikely to

---

[4] Section 17 states in its entirety:

> The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue without probable cause shown by affidavit, particularly describing the place to be searched and the person or thing to be seized.

Idaho Const. art. I, § 17. This is virtually identical to the Fourth Amendment.

MEMORANDUM DECISION AND ORDER – 9

succeed in his arguments under the Idaho Constitution.

2. **Irreparable Harm**

Tanner cites to *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017), for the conclusion that his "deprivation of constitutional rights unquestionably constitutes irreparable injury." Dkt. 30-1, at 13–14. Though this is a correct statement of law, based on the above analysis it is inapplicable to this case. Because the Court has already found that there was likely no Fourth Amendment violation, there is no such unquestionable irreparable injury.

Further, the Court cannot find any other irreparable harm that would befall Tanner if the wildlife check stations continue to operate. As described above, IFG may subject him to occasional brief stops lasting a few seconds. If he chooses to engage in hunting, fishing, or trapping, these stops might last a few minutes. If these stops are constitutional, as the Court thinks they likely are, then such brief stops could hardly be categorized as harmful, much less irreparably so. Thus, Tanner has not shown that he will suffer irreparable harm and this factor weighs against a preliminary injunction.

3. **Balance of the Equities and Public Interest**

Like Tanner's argument in the preceding section, his arguments that the balance of equities tips in his favor and that the public would benefit from an injunction are premised on the belief that IFG's wildlife check stations violate the Fourth Amendment. As such, he contends, equity requires IFG to cease unlawful operations because such operations violate the rights of Idaho citizens.

The Court, however, is not persuaded by Tanner's arguments. As there was likely no Fourth Amendment violation, IFG likely has not engaged in an unlawful activity. Accordingly, the balance of the equities and the public interest both favor IFG given Idaho's compelling interest of preserving and managing its wildlife. Thus, Tanner has not shown that the balance of the equities tips in his favor, nor has he shown that an injunction would be in the public interest. These factors weigh against a preliminary injunction.

## V. CONCLUSION

Because the Court finds that: (1) Tanner is unlikely succeed on the merits of his claims; (2) Tanner will not suffer irreparable injury without the preliminary injunction; (3) the balance of the equities tips in the Government's favor; and (4) an injunction is not the public interest, the Court will not issue a preliminary injunction.

## VI. ORDER

IT IS HEREBY ORDERED THAT:

1. Tanner's Motion for a Preliminary Injunction (Dkt. 30) is DENIED.

DATED: October 3, 2019

David C. Nye
Chief U.S. District Court Judge