UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| STEVE TANNER,<br><br>        Plaintiff,<br><br>    v.<br><br>IDAHO DEPARTMENT OF FISH AND<br>GAME DIRECTOR ED SCHRIEVER;<br>VIRGIL MOORE; LUCAS SWANSON;<br>JOSH STANLEY; BRIAN JOHNSON;<br>and WILLIE COWELL,<br><br>        Defendants. | Case No. 2:18-cv-00456-DCN<br><br>**MEMORANDUM DECISION AND<br>ORDER** |

## I. INTRODUCTION

Pending before the Court is Defendant Willie Cowell's Motion for Summary Judgment (Dkt. 72) and Defendants Idaho Department of Fish and Game Director Ed Schriever, Virgil Moore, Lucas Swanson, Josh Stanley, and Brian Johnson's ("IDFG Defendants") Motion for Summary Judgment (Dkt. 73). On July 15, 2020, the Court held oral argument and took the motions under advisement. Upon review, and for the reasons set forth below, the Court GRANTS both Motions.

## II. BACKGROUND

The Idaho Department of Fish & Game ("IDFG"), a government agency, utilizes wildlife check stations to manage Idaho's wildlife resources. At these check stations, IDFG officers stop all vehicles passing through and inquire if the driver and/or passengers have been hunting, fishing, or trapping. If the answer is no, the officers ask no further questions

and the vehicle proceeds on its way. These stops rarely last longer than a few seconds. If the answer is yes, the officers spend a few minutes collecting data, receiving public input, and, if necessary, enforcing state laws that pertain to the management and conservation of wildlife resources.

During the daylight hours on November 18, 2017, Plaintiff Steve Tanner was working at his residence when he saw multiple IDFG vehicles drive north past his house. Tanner drove north, up Meadow Creek Road, and saw that IDFG had set up the Meadow Creek game check station. Dkt. 72-2, ¶ 4. Tanner parked his vehicle north of the check station and hiked the area trying to "investigate" and take photographs of the check station. Dkt. 72-2, ¶ 5. Tanner returned to his vehicle and headed home. It was now early evening and Tanner was travelling southbound on Meadow Creek Road in Boundary County, Idaho. At that time, Defendants Swanson, Stanley, and Johnson—employees of IDFG— were operating a wildlife check station on Meadow Creek Road in the southbound lane. As Tanner approached the station, he bypassed it without stopping.

Swanson and Stanley pursued Tanner in their patrol vehicle for several miles with their overhead lights activated. Tanner eventually pulled into a gas station. Subsequently, Swanson placed Tanner in handcuffs and informed him that he was being placed under arrest. Swanson then turned Tanner over to Defendant Cowell of the Bonner's Ferry Police Department. Cowell placed Tanner in a different set of handcuffs, frisked him, and loaded him into his patrol vehicle. Swanson ultimately cited Tanner for failing to stop at the check station and for eluding a law enforcement officer. Charges were brought against Tanner in Idaho First Judicial Court, Magistrate Division, CR-2017-0001192, and were subsequently

dismissed. No other charges were brought against Tanner. Specifically, Cowell did not charge Tanner with any crime.

On September 24, 2018, Tanner filed a civil suit in Idaho state court. Tanner alleged that the IDFG violated his constitutional rights when its police officers pulled him over and arrested him after he failed to stop at a wildlife check station. On October 17, 2018, Defendant Cowell removed the case to this Court pursuant to 28 U.S.C. §§ 1331, 1441(b), and 1446(b). On November 20, 2018, Tanner filed his Amended Complaint. Dkt. 4.

On December 27, 2019, Cowell and IDFG Defendants filed motions for summary judgment. Dkts. 72, 73. The day before, Tanner filed a motion to stay proceedings pending his appeal of this Court's denial of Tanner's Motion for a Preliminary Injunction. Dkt. 71. Before the Court could rule on Tanner's Motion to Stay Proceedings, the Ninth Circuit denied Tanner's interlocutory appeal, *Tanner v. Cowell*, 792 F. App'x 545, 545–46 (9th Cir. 2020), and the Court held Tanner's Motion to Stay moot, (Dkt. 81). The Court then ordered that summary judgment briefings resume. Dkt. 81.

On March 11, 2020, Tanner filed his opposition to both Cowell's and IDFG Defendants' motions for summary judgment (Dkt. 85); IDFG Defendants filed their reply on March 24, 2020 (Dkt. 88), as did Cowell (Dkt. 89).

### III. LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). This Court's role at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."

*Zetwick v. Cty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (citation omitted). In considering a motion for summary judgment, this Court must "view[] the facts in the non-moving party's favor . . . ." *Id.* To defeat a motion for summary judgment, the respondent need only present evidence upon which "a reasonable juror drawing all inferences in favor of the respondent could return a verdict in [his or her] favor." *Id.* (citation omitted).

Accordingly, this Court must enter summary judgment if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The respondent cannot simply rely on an unsworn affidavit or the pleadings to defeat a motion for summary judgment; rather the respondent must set forth the "specific facts," supported by evidence, with "reasonable particularity" that preclude summary judgment. *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001).

## IV. DISCUSSION

Tanner asserts four causes of action in his Amended Complaint. Dkt. 4. Tanner's first cause of action is a 42 U.S.C. § 1983 claim against Defendants Swanson, Stanley, and Johnson for constitutional violations relating to his arrest after failing to stop at the IDFG wildlife check station. Tanner's second cause of action is a § 1983 claim against Defendant Moore for establishing a policy that allows for the use of roadblocks for wildlife check stations. Tanner's third cause of action is a § 1983 claim against Defendant Cowell, also relating to his arrest. Tanner's fourth cause of action is for declaratory judgment and injunctive relief; he seeks to enjoin Defendants from operating wildlife check roadblocks

and to mandate that Defendants only stop fishermen, hunters, and trappers at wildlife check stations, rather than the public at large.

All the causes of action concern, to at least some degree, whether IDFG's wildlife checkpoints violated the Fourth Amendment and/or Article 1 § 17 of the Idaho Constitution. Much of the IDFG Defendants' summary judgment arguments turn on whether the use of check station roadblocks under Idaho Code § 36-1201 violates the Fourth Amendment, the Idaho Constitution, or Idaho Code § 19-621. *See generally* Dkts. 72, 73. Thus, the Court will first evaluate whether the wildlife check stations violate federal or state law before turning in detail to each of Tanner's individual causes of actions.

### A. Legality of IDFG Wildlife Checkpoints

#### 1. *Applicable State Law*

First, the parties dispute which statute is applicable in reviewing the legality of IDFG's checkpoints. Tanner alleges that IDFG's use of roadblocks at its wildlife checkpoints violates state law. He contends that Idaho Code § 19-621 grants appropriate executive branch officials the authority to establish roadblocks "only where it is reasonably believed that persons have broken the law," and roadblocks at routine wildlife checkpoint violate this statute. Dkt. 85, at 18. The IDFG Defendants move to dismiss on the grounds that that the wildlife checkpoints are "authorized by I.C. §§ 36-103(b), 36-1201(b), and regulations established thereunder," not § 19-621. Dkt. 73-1, at 6. The IDFG Defendants assert that state courts have affirmed the legislature's right to use routine check stations in *State v. Thurman*, 996 P.2d 309, 314 (Idaho Ct. App. 1999), and *State v. Medley*, 898 P.2d 1093, 1097 (Idaho 1994).

MEMORANDUM DECISION AND ORDER - 5

In *Medley*, the court determined the wildlife checkpoint stop at issue violated the Fourth Amendment of the U.S. Constitution. *Medley*, 898 P.2d at 1099 (holding unconstitutional a *non*-routine IDFG fish and game check station in which the IDFG officer in charge of the station issued a "blanket invitation" to any additional law enforcement agency that wished to participate so that violations of laws not pertaining to fish and game (and in no way related to advancing the public's interest in wildlife management) could be detected). In its ruling, the Idaho Supreme Court noted, "[i]n *State v. Henderson*, 756 P.2d 1057 (Idaho 1988), we expressed no view as to whether fish and game roadblocks complied with state constitutional requirements." *Medley*, 898 P.2d at 1099. Thus, the *Medley* court determined it, too, would express no view on whether the wildlife checkpoint stop complied with *state* constitutional requirements, as it had already held it did not comply with federal constitutional requirements. However, the *Medley* court did state that "the legislature has provided statutory authority supporting the use of check stations maintained by the Department for the purpose of checking fish and game licenses and lawful possession of wildlife. I.C. § 36-1201" *Id.* at 1097. It cited to § 36-1201, not § 19-621, to support its statement that IDGF was statutorily authorized to use wildlife check stations.

In *Thurman*, the Idaho Court of Appeals upheld the use of a wildlife checkpoint station as constitutional under state and federal law. 996 P.2d 309. The *Thurman* court began its analysis by definitively stating "[t]he Idaho legislature has provided statutory authority to the Idaho Department of Fish and Game to conduct routine check stations. I.C. § 36–103(b); I.C. § 36–1201(b)." *Thurman,* 996 P.2d at 313. In that case, the IDFG check station was set up "on a straight stretch of roadway" and the IDFG officer "parked his truck

MEMORANDUM DECISION AND ORDER - 6

perpendicular to the roadway[.]" *Id.* at 314. While the *Thurman* court never used the term "roadblock" in referring to the impromptu checkpoint, it positively cited to an Oregon case upholding the use "where a fish and game roadblock was conducted to check hunters' compliance with game laws." *Id.* at 316 (citing *State v. Tourtillott,* 618 P.2d 423, 430 (Or. 1980)).

Idaho Code § 19-621 was enacted in 1957. S.L. 1957, ch. 31, § 2. Both *Thurman* and *Medley* were issued decades after § 19-621's enactment. Neither case offer any indication that § 19-621 applies to IDFG check stations—roadblocks or otherwise. Rather, they both assert that § 36-1201 is the controlling statutory authority governing the implementation and use of such checkpoints. Therefore, the Court abides by Idaho Supreme Court precedent and finds that wildlife checkpoints, whether "roadblocks" or otherwise, maintained by IDFG are authorized by § 36-1201 for the purpose of checking fish and game licenses and lawful possession of wildlife. Idaho Code § 19-621 is not relevant in this case.

Finding § 36-1201 is the applicable law, the Court turns next to whether the way IDFG operates the wildlife checkpoints under § 36-1201 is constitutional.

2. *Constitutionality of the Wildlife Checkpoints Under the Fourth Amendment of the U.S. Constitution*

Idaho Code § 36-1201 states that "[n]o fisherman, hunter or trapper shall refuse or fail to . . . [s]top and report at a wildlife check station encountered on his route of travel when directed to do so by personnel on duty." Tanner challenges the constitutionality of IDFG's use of check stations, arguing that utilizing roadblocks primarily for law

MEMORANDUM DECISION AND ORDER - 7

enforcement purposes violates the Fourth Amendment and its state counterpart—Article I, Section 17 of the Idaho Constitution. Tanner claims that the plain language of § 36-1201 does not give IDFG authority to stop citizens, such as himself, who are not fishermen, hunters, or trappers. Dkt. 85. As such, he believes that an unreasonable seizure occurs whenever IDFG stops one of these "non-sportsmen" citizens at wildlife check stations. Dkt. 85, at 2.

"The Fourth Amendment applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest." *U.S. v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975). "[S]topping an automobile and detaining its occupants constitute a 'seizure' within the meaning of [the Fourth] Amendment[], even though the purpose of the stop is limited and the resulting detention is quite brief." *Delaware v. Prouse*, 440 U.S. 648, 653 (1979). Thus, checkpoint station stops, such as the wildlife check station here, constitute a seizure under the Fourth Amendment.

Not every seizure, however, violates the Fourth Amendment—only unreasonable seizures do. The Ninth Circuit applies the following two-step analysis to determine reasonableness applicable to Fourth Amendment checkpoint cases:

> First, the court must determine whether the primary purpose of the checkpoint was to advance the general interest in crime control. If so, then the stop is per se invalid under the Fourth Amendment.

> If the checkpoint is not per se invalid as a crime control device, then the court must judge the checkpoint's reasonableness, hence, its constitutionality, on the basis of the individual circumstances. This requires consideration of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty.

MEMORANDUM DECISION AND ORDER - 8

*U.S. v. Fraire*, 575 F.3d 929, 932 (9th Cir. 2009) (internal quotation marks and citations omitted).

    a.  <u>Primary Purpose of Wildlife Check Stations</u>

First, the Court must determine whether the IDFG wildlife check stations are general crime control devices. According to a policy statement issued by the IDFG, the purpose of wildlife check stations is "[t]o effectively manage the state's wildlife resources" by making field contacts with sportsmen, collecting biological and harvest data to support wildlife management plans, receiving public input, and enforcing state laws and rules. Dkt. 30-2, at 1.

Tanner argues that the primary purpose of wildlife check stations "is indistinguishable from the general interest in crime control . . . ." Dkt. 85, at 9. To support his position, Tanner cites *Indianapolis v. Edmond*, 531 U.S. 32 (2000), in which the Supreme Court held that the narcotics checkpoints at issue were per se unconstitutional because the checkpoints' primary purpose was crime control. "We cannot sanction stops justified *only* by the generalized and ever-present possibility that interrogation and inspection may reveal that any given motorist has committed some crime." *Edmond*, 531 U.S. at 44 (emphasis added); *see also Henderson*, 756 P.2d, at 1063–64 (stating that absent individualized suspicion of wrongdoing or prior legislative or judicial approval to establish such roadblocks, "roadblocks established to apprehend drunk drivers cannot withstand constitutional scrutiny").

Tanner asserts that because (1) the wildlife check station on Meadow Creek Road

MEMORANDUM DECISION AND ORDER - 9

was staffed by IDFG officers and not biologists;[1] (Dkt. 85) (2) the officers detected a hunter who killed a deer without the proper tag (Dkt. 31-2, ¶ 8); (3) Tanner was arrested for failing to stop at the checkpoint, investigated for a DUI, and subsequently arrested for a DUI and obstructing an officer in the line of duty (Dkt. 85); and (4) all of these "ordinary law enforcement violations spring from the IDFGs [sic] enforcement game check stations designed primarily for the interdiction of illegal hunting," its primary purpose is for general law enforcement purposes (Dkt. 85, at 10–11).

To the contrary, there is compelling authority that the primary purpose for wildlife check stations is not for general law enforcement. In *Fraire*, the Ninth Circuit held that a wildlife checkpoint stationed at the entrance to a national park was not per se invalid because its primary goal was prevention of illegal hunting activity, not conducting arrests, and that there was a "close connection between the checkpoint and the harm it was seeking to prevent." *Fraire*, 575 F.3d at 933. Though wildlife check stations may certainly lead to the enforcement of criminal statutes, "the use of law enforcement techniques does not automatically transform [them] into a crime control device for Fourth Amendment purposes." *Id*. Idaho courts have also held that routine IDFG wildlife check stations primarily serve compelling state interests other than crime control. *See Medley*, 898 P.2d at 1097 (holding the state of Idaho "has a compelling interest in the management and

---

[1] Tanner claims IDFG operates two types of check stations: management check stations staffed by biologists, and impromptu enforcement check stations staffed by conservation officers. Dkt. 85. The former, he argues, primarily gather biological data to help manage wildlife, while the latter primarily enforces Idaho wildlife laws. *Id*.

conservation of its natural resources, including wildlife"); *Thurman*, 996 P.2d at 314 (stating that wildlife is "a resource to be preserved, protected, perpetuated and managed . . . .").

Like the wildlife checkpoints in *Fraire* that were closely connected to the goal of preventing illegal hunting, the IDFG check stations here are closely connected to the goal of effectively managing the state's wildlife resources. Even if biologists do not collect biological data at these check stations, the check stations still advance the IDFG's primary purpose to "[m]ake field contact with anglers, hunters, and trappers to collect . . . harvest data to support evaluation and development of wildlife management plans and programs." Dkt. 30-2, at 1. The fact that officials may use law enforcement techniques at these check stations does not transform the check station's primary goal of effective wildlife management into crime control. Unlike the narcotics checkpoints in *Edmond* (or the drunk driving checkpoints in *Henderson*) that were justified only by the possibility that an inspection might reveal any given motorist has committed a crime, the IDFG wildlife check stations' primary justification is narrowly focused to advance the public's interest in wildlife preservation and management and not to advance general law enforcement. Thus, the Court finds that the IDFG wildlife check stations are not general crime control devices and that Idaho Code § 36-1201 is not per se invalid.

      b.  Reasonableness of Utilizing Wildlife Check Stations to Manage the State's Wildlife Resources

Next, the Court must determine the check station's "reasonableness, hence, its constitutionality, on the basis of the individual circumstances." *Fraire*, 575 F.3d at 932

MEMORANDUM DECISION AND ORDER - 11

(citation omitted). This considers "the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." *Id.* (quoting *Illinois v. Lidster*, 540 U.S. 419, 427 (2004)).

The first consideration is the gravity of public concerns served by wildlife check stations. The Court finds that Idaho has a compelling interest in the management and conservation of its natural resources, including wildlife. This interest is not only codified in Idaho Code § 36-103, but has also been acknowledged by the Idaho Supreme Court. *See Medley*, 898 P.2d at 1097 ("[F]ish and game violations are matters of grave public concern which justify minimal intrusion into the public's right of privacy.").

The second consideration is the degree to which wildlife check stations advance the public interest. The Idaho Supreme Court has stated, "*Routine* fish and game check stations are indeed an effective method for advancing [public] interest . . . . Requiring conservation officers, under these circumstances, to have probable cause before stopping suspected violators would be an enormous burden." *Medley*, 898 P.2d at 1097–98.

The Court agrees with both this conclusion and its reasoning. IDFG has operated a check station at the same place on Meadow Creek Road on multiple occasions and when hunters were often present. Dkt. 72-2, ¶ 1; Dkt. 73-3, ¶¶ 1, 4. These routine check stations are designed to quickly and efficiently gather the necessary information to assist in maintaining, protecting, and conserving Idaho's wildlife. Dkt. 72, ¶ 3; Dkt. 73-3, ¶¶ 9–10. The Court finds that the IDFG wildlife check stations advance the public interest to a

significant degree.[2]

The third and final consideration is the degree to which the severity of the wildlife check station interferes with individual liberty. This factor is broken into two subparts: an objective part and a subjective part. *Fraire*, 575 F.3d at 934. The objective part focuses on the "duration of the seizure and the intensity of the investigation." *Id.* Here, the duration of the stops at IDFG check stations vary from a few seconds if the passengers have not engaged in hunting, fishing, or trapping (Dkt. 72-2, ¶ 3; Dkt. 73-3, ¶ 8), to a few minutes if the passengers have engaged in such activities (Dkt. 73-3, ¶ 9).

Tanner does not dispute the duration of the stops were reasonable. Instead, he argues that it is an invasion of privacy to stop *non-sportsmen* in order to "question hunters, check their licenses, inquire about game taken, inspect game in hunters' possession, and collect biological data." Dkt. 85, at 22. However, the IDFG check stations do not subject non-sportsmen to license checks, game inspections, or collecting biological data. The only inquiry that occurs for non-sportsmen is whether the passengers have been hunting or fishing. If the answer is no, "no further questions would be asked and the vehicle would be sent on its way . . . ." Dkt. 73-3, ¶ 8. Without such questioning, it is unclear how IDFG officials would be able to determine who are sportsmen subject to Idaho Code § 36-1201

---

[2] Tanner does not dispute the effectiveness of the IDFG check stations at maintaining and protecting Idaho's wildlife but argues that the check stations "do not educate or take public input" and that they "do not [disseminate] educational material" as was done at the wildlife checkpoint in *Fraire*. Dkt. 85, at 12. Even if educating the public and receiving public input were required elements for advancing public interest, the Court disagrees with Tanner's assertion. At a minimum, these brief stops at IDFG check stations educate both sportsmen and non-sportsmen about Idaho's values and efforts to maintain and preserve wildlife in the state.

and who are not; IDFG distinguishes between the two categories quickly through a brief, concise inquiry.

In this case, there technically was no seizure because Tanner bypassed the wildlife check station.[3] Had he stopped, the duration of the seizure likely would have been only a few seconds because Tanner is not a hunter, fisher, or trapper, and was not engaged in such activities that day. Tanner would only have needed to answer the officer's first question in the negative and he would have been sent on his way. Tanner has submitted no evidence that non-sportsmen are delayed more than a few seconds to confirm they are not a "hunter, fisher, or trapper" subject to the additional search and seizure procedures authorized under Idaho Code § 36-1201. Therefore, the Court finds that the duration of the seizure and intensity of the IDFG wildlife checkpoint investigation of non-sportsmen is minimal and reasonable.

The second part of this factor—the subjective part—focuses on "the fear and surprise engendered in law-abiding motorists by the nature of the stop." *Fraire*, 575 F.3d at 934. Tanner asserts that the manner in which the wildlife check station was operated was unsafe, being located on a sharp curve, after sunset,[4] and operated by officers who were

---

[3] Tanner asserts in his response to the Motions for Summary Judgment that he had been stopped at similar IDFG checkpoints on November 20, 2010, and November 8, 2014. Dkt. 85, at 2–3.

[4] According to Tanner's Second Amended Complaint, sunset occurred at 4:01 PM on the day in question, and that Tanner drove around the IDFG check station at approximately 4:20 PM. Dkt. 66, ¶¶ 14–15.

MEMORANDUM DECISION AND ORDER - 14

not wearing proper reflective safety apparel.[5] Dkt. 85. According to Tanner:

> [Tanner], driving south, approached the [check station] area, passing two signs warning of a check station ahead. The signage did not warn of a *stop* ahead, nor did the signage inform those persons who were required to stop at the check station, as required by [Idaho Code] 19-622, and 36-1201. (Photo Exhibit CC)[6] [Tanner] continued slowing as he rounded the first corner when a flashing blue light, located about 30 feet north of the roadway, was activated for about 2-3 seconds. The curved section of the road precluded the oncoming traffic from seeing the check station roadblock until they rounded the corner about 300 feet away. [Tanner] continued to slow his vehicle, and when he was about 150 feet from the sharp corner, the flashing blue light was turned off. [Tanner] proceeded, at a safe speed . . . , around a stopped vehicle in his lane and continued south. There was no lighting to light the area, no one was directing traffic at this [check station], and no sign directed [Tanner] to stop.

Dkt. 85, at 4.

As a general matter, "[t]he subjective intrusion from a checkpoint stop is significantly less than other types of seizures, such as random stops." *Fraire*, 575 F.3d at 934. In *Fraire*, the court held the subjective intrusion of the national park checkpoint was minimal because "[t]he checkpoint was accompanied by signs announcing it, the rangers operating it were uniformed, and all approaching vehicles were stopped." *Id.* Similarly, in *Thurman*, the Idaho Court of Appeals found that although some of the wildlife checkpoint stops occurred in the dark, the reflective warning signs and blue flashing light alerted

---

[5] Based on these assertions, it appears Tanner is making a separate "as-applied" challenge to § 36-1201 due to the unsafe manner in which this particular wildlife check station was operated. Accordingly, the Court does not consider these assertions as a separate constitutional attack, but only as evidence of the severity of this wildlife check station's subjective intrusion.

[6] Exhibit CC as provided by Tanner is an undated photograph of an IDFG sign that reads, "STOP IDAHO DEPT OF FISH & GAME CHECK STATION." Dkt. 85-10, at 2. No affidavit accompanies the photograph attesting to where or when the photograph of the sign was taken or who took it.

travelers to the check station's presence, and that "the subjective potential for causing fear at checkpoints was low because motorists can see *visible signs of authority*, including uniformed officers." *Thurman*, 996 P.2d at 315 (emphasis added) (citing *Mich. Dep't of State Police v. Sitz*, 496 U.S. 444, 452–53 (1990).

In the present case, Tanner stated in his affidavit that while driving south on Meadow Creek Road, he "passed two ground-mounted signs stating, 'SLOW, IDAHO DEPT OF FISH & GAME, CHECK STATION.'" Dkt. 85-3, ("Plaintiff's Affidavit"), at 9. As he neared the check station, Tanner saw "a flashing blue light . . . activate[] for about two to three seconds." Plaintiff's Affidavit, at 10. In response to these signs and the flashing blue light, "[Tanner] continued to slow his vehicle, and when about 150 feet from a vehicle stopped in the southbound lane, the flashing blue light was turned off." Plaintiff's Affidavit, at 10.

Tanner states that after seeing the warning and flashing blue lights, he proceeded "at a safe speed of about 15 miles per hour." Plaintiff's Affidavit, at 10. Upon approaching the check station, Tanner testified there was "a vehicle blocking the southbound lane," and he drove around it, into the northbound lane, continuing south as he bypassed the check station. Dkt. 73-2, Tanner Depo., at 25–26; *see also* Plaintiff's Affidavit, at 10 ("Tanner pulled to the left of a vehicle stopped in the southbound lane and proceeded around the sharp curve, passing the [check station] area at a safe speed of about 15 miles per hour."). As he drove by the check station, Tanner stated that "it was obvious to [him] that it was an Idaho Fish & Game check station." Dkt. 85-7, Tanner Depo., at 45. Additionally, he asserts that "[t]he curved section of road precluded the oncoming traffic from seeing the check

station roadblock until they rounded the corner about 300 feet away." Dkt. 85, at 4

Like the wildlife checkpoint in *Fraire*, the IDFG check station was accompanied by multiple reflective signs announcing the check station ahead, the officers operating it were uniformed, and another vehicle that had approached the check station was stopped.[7] The question, then, is whether the fact that the check station was operated after sunset, in the dark, without proper lighting, and by officers without reflective attire is material such that a reasonable juror could return a verdict in Tanner's favor.

Like the court in *Thurman*, this Court finds that although the check station was operated after sunset, in the dark, without lighting, and by officers without reflective attire, these are not facts that are material to the outcome of this case. The visible signs of authority that Tanner saw within the IDFG check station area—including the reflective warning signs, a blue flashing light, and uniformed officers—decreases the subjective potential for causing fear in unsuspecting motorists because it would also be "obvious" to them, as it was to Tanner (Dkt. 85-7, Tanner Depo., at 45), that it was an IDFG check station.

The Court finds that no reasonable juror, considering these facts, could conclude

---

[7] Tanner attempts to distinguish this case by emphasizing that the checkpoint in *Fraire* was located at a national park entrance where visitors would expect to briefly stop, while the IDFG check station was located along a curved road. However, the *Fraire* court noted that the checkpoint's location at the national park entrance was "not a dispositive point." *Fraire*, 575 F.3d at 934. Likewise, this Court notes, as a non-dispositive factor, that the IDFG check station was located along a road frequented by hunters near potential hunting areas. *See* Dkt. 73-3, ¶ 4. Non-sportsman travelers on Meadow Creek Road, although perhaps not expecting to be stopped at that very place, would not be afraid or surprised by the nature of the stop because, as Tanner stated, the stops occurred "at a time and location when hunters would be returning from their hunts." Dkt. 85, at 13.

that the location of this check station would cause fear and surprise in law-abiding motorists sufficient to interfere with individual liberty to any significant degree. The location of the check station was announced by two reflective signs with the words, "SLOW, IDAHO DEPT OF FISH & GAME, CHECK STATION," and a blue flashing light was visible to southbound traffic from over 150 feet from the check station. Oncoming traffic could also see the check station from 300 feet away, giving plenty of time for drivers to react in a safe manner to the unexpected check station, even though it was operated along a "sharp" curve. Tanner himself felt the section of road where the check station was located was safe enough for him to drive slowly around the stopped vehicle in the oncoming traffic's lane. Although Tanner could not see a visible "stop" sign as he drove by the check station, the multiple "slow" signs, blue flashing lights, uniformed officers, and stopped vehicles in his lane would not reasonably cause anxiety or alarm in unsuspecting motorists to any significant degree. Thus, the Court finds that the subjective intrusion of the IDFG wildlife check station in this case was minimal.

       c.  <u>Conclusion</u>

The Court finds that no reasonable juror, drawing all inferences in favor of Tanner, could return a verdict in his favor. In this case, the public concern for wildlife management was high, the check station significantly advanced this public interest, and the objective and subjective interference with individual liberty was minimal and reasonable. It follows that the check station was reasonable under the Fourth Amendment. Even if the check station were operated under the conditions Tanner described, he has not met his burden to respond with specific facts, supported by evidence, with reasonable particularity, to

MEMORANDUM DECISION AND ORDER - 18

establish a dispute of fact exists that precludes the Court from issuing summary judgment on this claim.

Tanner has not offered any evidence that would allow a reasonable juror, drawing all inferences in Tanner's favor, to conclude that IDFG wildlife check stations violate the Fourth Amendment.

>   3. *Constitutionality of the Wildlife Checkpoints Under Article I, Section 17 of the*
>       *Idaho Constitution*

"Article I, § 17 of the Idaho Constitution provides no greater protection in these situations than does the Fourth Amendment to the United States Constitution." *State v. Thurman,* 996 P.2d 309, 315 (Idaho Ct. App. 1999) (declining to hold that Idaho's Constitution provides greater protection to the hunting public in wildlife checkpoint stops than does the Fourth Amendment of the U.S. Constitution).

As routine IDFG wildlife checkpoint stops such as the one before the Court are constitutional under the Fourth Amendment of the U.S. Constitution, they are likewise constitutional under Article I, section 17 of the Idaho Constitution.

**B. Tanner's First Cause of Action**

Tanner's first cause of action against Defendants Swanson, Stanley, and Johnson is brought pursuant to 42 U.S.C. § 1983. In general, "[t]o establish § 1983 liability, a plaintiff must show both: (1) deprivation of a right secured by the Constitution and laws of the United States; and (2) that the deprivation was committed by a person acting under color of state law." *Chudacoff v. Univ. Med. Ctr. of S. Nev.*, 649 F.3d 1143, 1149 (9th Cir. 2011) (citing *Broam v. Bogan*, 320 F.3d 1023, 1028 (9th Cir. 2003)). "Dismissal of a § 1983

claim is proper if the complaint is devoid of factual allegations that give rise to a plausible inference of either element." *Naffe v. Frey*, 789 F.3d 1030, 1036 (9th Cir. 2015).

Courts treat the "under color of law" requirement of § 1983 cases as identical to the "state action" requirement of the Fourteenth Amendment. *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982). No party disputes the individual Defendants in this case were acting under color of state law. Thus, the only question is whether they deprived Tanner of his Constitutional rights.

Tanner essentially alleges two constitutional violations. He asserts that his arrest by Defendants Swanson and Stanley for failing to stop at the checkpoint was unconstitutional as they lacked probable cause. He also contends that Defendants Swanson, Stanley, and Johnson violated his First Amendment rights by specifically targeting his car in retaliation to his complaints to state representatives (as well as other public officials and entities) about the IDFG checkpoints. He alleges Defendants Swanson, Stanley, and Johnson knew that Tanner was not a hunter, fisherman, or trapper, and the stop was pretextual.

In his Complaint, it appears that Tanner also takes issue with the officers' failure to follow procedure during the night of the incident. It is unclear if Tanner is alleging that Defendants Swanson and Stanley violated his Fifth Amendment rights by failing to read him his *Miranda* rights upon arrest and/or if he is alleging Defendants Swanson, Stanley, and Johnson's operation of the wildlife checkpoint station at Meadow Creek Road violated state law and federal regulation. Reading his *pro se* Complaint liberally, the Court will construe his complaint as alleging two additional constitutional claims against Defendants.

1.   *Fourth Amendment: False Arrest*

Tanner asserts Defendants Swanson, Stanley, and Johnson are liable for false arrest. "A claim for unlawful arrest is cognizable under § 1983 as a violation of the Fourth Amendment, provided the arrest was without probable cause or other justification." *Dubner v. City & Cnty. of S.F.,* 266 F.3d 959, 964 (9th Cir. 2001). "Probable cause exists when there is a fair probability or substantial chance of criminal activity." *United States v. Patayan Soriano*, 361 F.3d 494, 505 (9th Cir. 2004) (quoting *United States v. Bishop*, 264 F.3d 919, 924 (9th Cir. 2001)) (internal quotation marks omitted). "It is well-settled that 'the determination of probable cause is based upon the totality of the circumstances known to the officers at the time of the search.'" *Id.* (quoting *Bishop*, 264 F.3d at 924).

To maintain an action for false arrest against Defendants Swanson, Stanley, and Johnson, Tanner must plead facts that would show they ordered or otherwise participated in the arrest and the arrest was without probable cause. There is no relevant dispute of fact here; Tanner does not deny that he failed to stop at the wildlife check station. Defendants Swanson, Stanley, and Johnson knew, at the time they pursued and arrested him, that Tanner had failed to stop at the station as required.

In the District Court of the First Judicial District of the State of Idaho, in and for the County of Boundary Magistrate Division, CR-2017-1192, the magistrate judge found the officers lacked probable cause to stop Tanner. Dkt 85-14, Transcript of January 11, 2018 Pretrial Conference, at 48. In so ruling, the magistrate judge reviewed the plain text of Idaho Code § 36–1201. Given that the statute only stated that fishermen, hunters, and trappers may be stopped at wildlife checkpoints, the magistrate judge held the officers

exceeded their statutory authority in attempting to stop everyone, even for a few seconds. Dkt 85-14, Transcript of January 11, 2018 Pretrial Conference, at 45. In response to the prosecutor's point that interpretation of the statute would essentially allow all fishermen, hunters, and trappers to drive past wildlife checkpoint stations unless they had a deer hanging up in plain sight, the magistrate judge said the officers should "profile[ motorists] and it happens all the time." *Id*. at 47.[8]

Regardless of what the magistrate judge held in the criminal case, this Court has the responsibility to independently review whether there was probable cause in deciding Tanner's civil claim that the officers violated his constitutional rights. Setting aside the fact that a pickup truck bypassing the check station when all other vehicles stop might be sufficient to raise reasonable suspicion, the magistrate judge's interpretation is not consistent with Idaho Court of Appeals' interpretation of § 36–1201(b) in *Thurman*. In *Thurman*, the court acknowledged that IDFG's "impromptu check station guidelines additionally provide that 'no check stations will be established and operated in a manner

---

[8] As a general note, the Ninth Circuit rejects broad profiling as a way of establishing reasonable suspicion. *United States v. Wrobel*, 295 F. Supp. 3d 1127, 1136 (D. Idaho 2018) ("The Ninth Circuit explicitly rejected officers' reliance on such broad profiles to create reasonable suspicion, because they sweep in innocents along with criminals, and lack any 'particular, individualized, and objectively observable factors which indicate that [a] person is engaged in criminal activity.'") (quoting *United States v. Rodriguez*, 976 F.2d 592, 596 (9th Cir. 1992) (rejecting "profile[s] of specific behavior very likely to sweep many ordinary citizens into a generality of suspicious appearance merely on a hunch."); *see also Sialoi v. City of San Diego*, 823 F.3d 1223, 1235 (9th Cir. 2016) ("[R]easonable suspicion may not be 'based on broad profiles which cast suspicion on entire categories of people without any individualized suspicion of the particular person to be stopped.'") (quoting *United States v. Sigmond–Ballesteros*, 285 F.3d 1117, 1121 (9th Cir. 2001) (alterations in original).

that will detain non-hunters or non-fishermen *unnecessarily*.' Generally, anything other than quickly determining whether the vehicle occupants have been hunting or fishing could be considered unnecessary delay." 996 P.2d at 314 (emphasis added). After acknowledging those guidelines, the *Thurman* court went on to hold that when the officer "quickly determine[d] if vehicle occupants had been fishing or hunting. . . . [he] acted reasonably pursuant to *statutory authority* and in substantial conformance with IDFG policy guidelines." *Id.* (emphasis added). Thus, the Court respectfully disagrees with the magistrate judge's interpretation of § 36-1201; the officers had the statutory authority under § 36-1201 to stop all vehicles in order to quickly determine if they had been fishing or hunting, though it could not unnecessarily delay non-sportsmen.

The Court finds Defendants Swanson, Stanley, and Johnson had probable cause, based on the totality of the circumstances, to believe Tanner may have violated § 36-1201. The Court dismisses Tanner's claim for unlawful arrest under § 1983 as his seizure was not a result of a violation of the Fourth Amendment.

2. *First Amendment Retaliation*

Tanner alleges he had previously complained about the constitutionality of the IDFG fish and game checkpoints to his representatives; that Defendants Swanson, Stanley, and Johnson knew that he had complained; and that said Defendants pursued him for his failure to stop at the IDFG checkpoint in order to retaliate against his prior complaints. In essence, Tanner alleges Defendants Cowell, Stanley, and Swanson arrested him for exercising his First Amendment rights.

"Official reprisal for protected speech 'offends the Constitution [because] it

threatens to inhibit exercise of the protected right[';] . . . the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out." *Lacey v. Maricopa Cty.*, 693 F.3d 896, 916–19 (9th Cir. 2012) (alterations in original) (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)).

In *Nieves v. Bartlett*, the Supreme Court held that a plaintiff pursuing a First Amendment retaliatory arrest claim must generally plead and prove the absence of probable cause for the arrest. — U.S. —, 139 S. Ct. 1715 (2019) (abrogating *Ford v. Yakima*, 706 F.3d 1188 (9th Cir. 2013) (per curiam)). The *Nieves* Court noted, however, "[a]lthough probable cause should generally defeat a retaliatory arrest claim, a narrow qualification is warranted for circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so." *Id.* at 1727. Thus, "the no-probable-cause requirement should not apply when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Id.*

During oral argument, Tanner stated he had no record of IDFG letting other people bypass the check station without stopping them; nor did he believe that such an event had ever occurred. He does not know of any other individual that went past the wildlife checkpoint station without stopping. Thus, *Nieves*'s no-probable-cause requirement applies. Tanner has not presented objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been. In other words, Tanner has not presented sufficient facts that individuals who had

MEMORANDUM DECISION AND ORDER - 24

*not* critiqued IDFG for their wildlife checkpoint stations were allowed to bypass the IDFG roadblock without being stopped.

Here, there was probable cause to arrest Tanner. He bypassed the IDFG wildlife checkpoint. He was pursued, arrested, and cited based on his failure to stop at the check station. As there was probable cause, the Court grants IDFG Defendants motion for summary judgment on Tanner's First Amendment retaliation claim.

### 3. *Fifth Amendment: Failure to Read Miranda Rights*

Tanner suggests that Stanley, Swanson, and Crowell's failure to read him his *Miranda* rights prior to arresting him gives rise to a viable § 1983 claim. Dkt. 4, ¶¶ 27, 31. Stanley and Swanson both admit they did not read Tanner his *Miranda* rights, asserting it was because they did not question Tanner. Dkt. 85-4, at 58, 78.

In *Chavez v. Martinez*, a plurality of the Supreme Court said "an officer's failure to read *Miranda* warnings to a plaintiff does "not violate [plaintiff's] constitutional rights and cannot be grounds for a § 1983 action." 538 U.S. 760, 772 (2003) (citing *Connecticut v. Barrett,* 479 U.S. 523, 528 (1987) (*Miranda*'s warning requirement is "not itself required by the Fifth Amendmen[t] . . . but is instead justified only by reference to its prophylactic purpose"); *see also Michigan v. Tucker,* 417 U.S. 433, 445 (1974) (*Miranda's* safeguards "were not themselves rights protected by the Constitution but were instead measures to insure that the right against compulsory self-incrimination was protected"). Thus, "an officer's failure to read *Miranda* warnings to a defendant before interrogation . . . [is] not actionable under § 1983." *Soo Park v. Thompson*, 851 F.3d 910, 926 (9th Cir. 2017).

To the extent that Tanner is alleging a § 1983 action against Stanley and Swanson

(or Crowell) due to their failure to read him *Miranda* warnings, the Court dismisses the claim.

### 4. *State Law or Federal Regulation*

It is unclear if Tanner seeks to assert a § 1983 claim against any of the IDFG Defendants for violating state law or federal regulation.[9] "[Section] 1983 does not provide a cause of action for alleged violations of state law." *Pototsky v. Napolitano*, 210 F. App'x 637, 637 (9th Cir. 2006). Additionally, § 1983 claim may only be asserted for violating a right secured by the Constitution and laws of the United States; it does not allow a cause of action simply for failure to abide by federal policy manuals.[10]

Ultimately, Tanner may not assert a § 1983 claim against any of the Defendants for violating state law or federal regulation generally. To the extent he is trying to do so, such claim is dismissed.

---

[9] IDFG Defendants posit Tanner may be doing so given the following allegation in his Amended Complaint:

> Defendants Swanson, Stanley and Johnson, under the color of law, operated the roadblocks on a sharp comer of Meadow Creak Road in an unsafe and dangerous way that violated the state and federal laws as to proper signage, and signage placement, and without a continuous flashing blue light at the roadblock *as required by Idaho Code 19-622 (2)-(4)*. In addition, these Defendants operated the roadblocks without proper illumination of the area at night and without wearing high visibility safety apparel *as required by the Federal Transportation Manual on Uniform Traffic Control Devices.* (as required by MUTCD § 6G.19 paragraph 10 and 6D.03 paragraph 06 and 6E.02 paragraph 03.)

Dkt. 4, at ¶ 61 (emphasis added).

[10] Policy setting and/or following may be an aspect that bolsters a § 1983 claim (*Monell v. Dep't of Social Services of the City of New York*, 436 U.S. 658 (1978)) but must be tied to an overarching claim of a deprivation of a right secured by the Constitution and laws of the United States; it cannot independently give rise to a § 1983 claim.

MEMORANDUM DECISION AND ORDER - 26

### 5. *Conclusion*

The Court need not address Defendants Swanson, Stanley and Johnson's qualified immunity defenses. The Court dismisses Tanner's claims pursuant to § 1983 against them because the Court finds they did not deprive Tanner of a Constitutional right.

### C. **Tanner's Second Cause of Action**

Tanner's second cause of action is a § 1983 claim against Defendant Moore for establishing IDFG Policy No. E-7 Section H and J that allows for the use of roadblocks for wildlife check stations. Tanner alleges the policy is unconstitutional in that it violates the Fourth Amendment and Article 1, section 17 of the Idaho Constitution.

Tanner has not provided evidence that any of the particular checkpoints he encountered, or any other check stations operated by IDFG pursuant to this policy, have been operated in an unconstitutional or unlawful manner. *See supra*. Thus, the Court does not find Defendant Moore's establishment of such a policy unconstitutional. The Court grants IDFG Defendants summary judgment on Tanner's Second Cause of Action.

### D. **Tanner's Third Cause of Action**

Tanner's third cause of action is a § 1983 claim against Defendant Cowell. He argues Cowell's frisk of Tanner was unreasonable and Cowell's subsequent placement of him in the patrol vehicle caused pain and suffering, violating his Fourth Amendment rights. Further, he alleges that Cowell punished him by conducting a "false arrest" when Tanner "exercise[d] his right to be remain silent." Dkt. 4, ¶¶ 74, 76. Cowell argues that he did not

violate Tanner's Fourth, Fifth, or Fourteenth Amendment rights.[11]

### 1. Fourth Amendment: Frisk

Tanner was under arrest when Cowell arrived at the scene but had not yet been frisked (or searched). Upon transfer, Cowell placed Tanner in a different set of handcuffs, frisked him, and loaded him into his patrol vehicle. Cowell later removed Tanner from the patrol vehicle and investigated him for any signs of DUI. Cowell found none and declined to issue a citation. Dkt. 87, ¶¶ 33–34 (citing Dkt. 73-2, Tanner Depo., at 43).

Defendants assert such a frisk was warranted because Tanner may have been armed and dangerous. Tanner responds that this argument is a farce as Defendants had no probable cause to believe he was armed and dangerous. The Court takes no position on this issue, however, as its resolution is inapplicable to the Court's analysis today.

Tanner was under arrest when frisked. "The Supreme Court and [the Ninth Circuit] have already held that a search incident to a lawful arrest is not limited to simple pat-down of the suspect and can 'involve a relatively extensive exploration' of the areas within the arrestee's immediate control." *United States v. Williams*, 846 F.3d 303, 312 (9th Cir. 2016) (quoting *United States v. Robinson*, 414 U.S. 218, 227 (1973)); *see also United States v. Maddox*, 614 F.3d 1046, 1048 (9th Cir. 2010). "Those areas include the arrestee's person and the inside pockets of the arrestee's clothing." *Williams*, 846 F.3d at 312. Here, the

---

[11] Cowell also argues that any state law claims against him should be dismissed due to failure to comply with Idaho Code § 6-908, which mandates plaintiffs must file a notice of tort claims. Tanner only alleged that Cowell violated his Fourth and Fifth Amendment rights. *See generally* Dkt. 4. As he did not allege any tort against Cowell, the Court cannot dismiss such a cause of action.

officers had probable cause to arrest Tanner; Cowell performed a valid search incident to arrest upon transfer of custody after Tanner was lawfully apprehended for failing to stop at the check station. The frisk, therefore, was constitutional.

*2. Excessive Force*

Tanner alleges in his Complaint the way Cowell handcuffed him and belted him in the patrol vehicle caused him "severe pain." Dkt. 4 at ¶ 30. *See also id*. at ¶ 73. He provides no further detail on how he was injured.

"The Fourth Amendment's requirement that a seizure be reasonable prohibits more than the unnecessary strike of a nightstick, sting of a bullet, and thud of a boot." *Fontana v. Haskin*, 262 F.3d 871, 878 (9th Cir. 2001). Under the Fourth Amendment, police may use only such force as is objectively reasonable under the circumstances. *Graham v. Connor*, 490 U.S. 386, 397 (1989); *White v. Pierce County*, 797 F.2d 812, 815 (9th Cir. 1986). Determining whether force used in making an arrest is excessive or reasonable "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.

"It is well-established that overly tight handcuffing can constitute excessive force." *Wall v. Cty. of Orange*, 364 F.3d 1107, 1112 (9th Cir. 2004) (citing *Meredith v. Erath,* 342 F.3d 1057, 1061, 1063–64 (9th Cir. 2003) (holding that "to place and keep [a person] in handcuffs that were so tight that they caused her unnecessary pain violated her Fourth Amendment right to be free from an unreasonable seizure"); *LaLonde v. County of*

*Riverside,* 204 F.3d 947, 960 (9th Cir. 2000) ("A series of Ninth Circuit cases has held that tight handcuffing can constitute excessive force.").

The Ninth Circuit has held, however, that "conclusory allegations" of injury from handcuffing which are "unsupported by factual data are insufficient to defeat" a motion for summary judgment. *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 922 (9th Cir. 2001). In *Arpin*, the plaintiff alleged that she suffered injury as a result of being handcuffed by an officer. The Ninth Circuit held that the plaintiff's failure to provide medical records or other evidence to support her claim of injury was insufficient to support a claim that the force used was unreasonable and excessive. *Id*. Similarly, in an unpublished Ninth Circuit opinion, the court held that it had previously found handcuffing to be an unreasonable application of force where "the plaintiffs either suffered damage to their wrists as a consequence of the handcuffs or the plaintiffs complained to the officers about the handcuffs being too tight." *Liiv v. City of Coeur D'Alene*, 130 F. App'x 848, 852 (9th Cir. 2005). In *Liiv*, because there was no "evidence of a physical manifestation of injury and notification to the police that the handcuffs were too tight," the Ninth Circuit held that the plaintiff could not establish that the officer had unreasonably tightened the handcuffs. *Id.*

Yet in a more recent unpublished Ninth Circuit decision, the court held that a plaintiff need not support a claim of excessive force due to tight handcuffs with proof of visible physical injury. An allegation that the handcuffs caused "unnecessary pain," is sufficient. *See Thompson v. Lake*, 607 F. App'x 624, 625–26 (9th Cir. 2015) (first citing *Meredith v. Erath*, 342 F.3d 1057, 1060, 1062–63 (9th Cir. 2003); then citing *LaLonde v.*

*County of Riverside*, 204 F.3d 947, 952, 960 (9th Cir. 2000)). In *LaLonde*, the Ninth Circuit held that a plaintiff's allegations that officers tightly handcuffed him and refused to loosen the handcuffs when he complained, was sufficient to defeat summary judgment for the defendant. 204 F.3d at 960.

At least two courts in this circuit have noted that the decisions in *Arpin* and *Thompson* appear to conflict. *See Smith v. Sergent,* No. 215CV0979GEBDBP, 2017 WL 4284659, at *6 (E.D. Cal. Sept. 27, 2017); *Chambers v. Steiger*, No. C14–1678–JCC–MAT, 2015 WL 9872531, at *8 (W.D. Wash. Oct. 29, 2015), *rep. and reco. adopted*, 2016 WL 235764 (W.D. Wash. Jan. 20, 2016). In *Arpin*, the Ninth Circuit required medical or other evidence of injury beyond the plaintiff's own claims. 261 F.3d at 922. In *Thompson*, the Ninth Circuit held that a plaintiff's claims of unnecessary pain were enough. 607 F. App'x at 625. Both *Smith* and *Chambers* found *Arpin* controlling and declined to follow the unpublished decision in *Thompson*. *See Smith*, No. 215CV0979GEBDBP, 2017 WL 4284659, at *6 ("It appears that most courts in this circuit have held that a plaintiff attempting to prove excessive force must show either a demonstrable injury or that he complained about the handcuffs being too tight and was ignored.") (first citing *Candler*, 2015 WL 2235674, at *8; then citing *Dillman v. Tuolumne County*, No. 1:13–CV–0404 LJO SKO, 2013 WL 1907379, at *8 (E.D. Cal. 2013)); *Weldon v. Conlee*, No. 1:13–cv–0540–LJO–SAB, 2015 WL 1811882, at *14 (E.D. Cal. Apr. 21, 2015), *aff'd*, 684 F. App'x 612 (9th Cir. 2017); *Gause v. Mullen*, No. CV 12–1439–PHX–RCB(MEA), 2013 WL 5163245, at *9 (D. Ariz. Sept. 12, 2013); *Nguyen v. San Diego Police Dept.*, No. 11cv2594–WQH–NLS, 2013 WL 12114518, at *9 (S.D. Cal. Aug. 15, 2013); *Bashkin v.*

*San Diego County*, No. 08cv1450–WQH–WVG, 2010 WL 2010853, at *7 (S.D. Cal. May 20, 2010); *cf. LaLonde*, 204 F.3d at 952; *Palmer v. Sanderson*, 9 F.3d 1433, 1434–36 (9th Cir. 1993)).

As noted above, Tanner's allegation that the way Cowell handcuffed him and belted him in the patrol vehicle caused him severe pain is sparse. In his response to Defendants' Motion for Summary Judgment, Tanner provides more information on what he is alleging:

> Cowell then belted Tanner in a position that caused pain and suffering, making deep marks on his wrists. Tanner has a right not to be subjected to pain and suffering at the hands of the Defendants. Cowell, Swanson, and Stanley's actions to arrest, handcuff and place in a confined area caused the Plaintiff "a lot of grief." Plaintiff was in severe pain due to the handcuffs and the position in which he was belted into the patrol vehicle.

Dkt. 85, at 30. In support of his allegations, he provided a copy of Officer's Cowell's body camera recording of that night, which he titles "PV--Police Video Recording" (Dkt. 85, at iv) on a USB drive.[12] The body camera video starts when Tanner was already handcuffed and placed in the back seat of Officer Cowell's vehicle. Cowell is assisting Tanner in getting out of the vehicle.

Around twenty-eight seconds into the body camera video, Tanner—still in the process of exiting the vehicle—can be heard saying, "Oh, it's killing my hands." PV, at 00:28. Cowell promptly responds, "I'm gonna, I'm gonna adjust those handcuffs when you get out. In fact, I'm gonna take them off of you here for a – there we go." *Id*. A few seconds later, when Tanner is out of the vehicle, Cowell can be heard asking Swanson on the scene,

---

[12] The file name for the recording is PICT0004-2017.11.18_16-36.08.

"Do you mind if I pull him out of handcuffs?" to which Swanson responds "sure." PV, at 00:54; Dkt. 85-14, at 15. Cowell proceeds to remove the handcuffs from Tanner. In sum, within one minute of Tanner voicing his complaint that the handcuffs were painful, Cowell had removed them. Cowell did not ignore Tanner's complaints of pain.

As Cowell was removing the handcuffs, Tanner asks, "You see that?" PV, at 01:33. Cowell responded, "I do." Tanner then seemingly asks someone else "Do you see it?" *Id.* It is not clear from the video what the parties are referring to. However, Tanner affirms that he was showing Cowell marks on his wrists from the handcuffs. Dkt. 85-1, at 8 (citing Plaintiff Affidavit, ¶ 101). Officer Swanson also remembers Tanner mentioning marks on his wrists and thinking Tanner was in some kind of pain. Dkt. 85-7, at 108. Cowell does not dispute that he was shown marks on Tanner's wrists from the handcuffs.

After being asked if Cowell "[saw that]," Cowell allowed Tanner to hold his hands "up here," in front of his body rather than be in handcuffs. PV, at 01:43. Tanner mentioned it was difficult for him to do that as he had a bad shoulder, and so Cowell allowed Tanner to hold his hands against his chest instead while Cowell asked Tanner if he understood why he was stopped. Tanner then stated he had the right to remain silent and he had a right to attorney. Cowell acknowledged both before proceeding to ask about whether Tanner was impaired or driving under the influence. Tanner objected to the additional questioning, stating he had already invoked his Fifth Amendment rights. Cowell continued to question Tanner. At the end of Cowell's questioning, he placed Tanner back in handcuffs, but handcuffed him with his arms in front, rather than behind his back. PV, at 03:36.

Tanner has not provided evidence of demonstrable injury from the way he was

handcuffed or belted. In his deposition, Tanner said he was claiming no medical expenses due to the November 18, 2017 incident. Dkt. 73-2, at 62:10–13.

Upon Tanner informing Cowell the handcuffs pained him, Cowell promptly removed them. As Tanner does not show a demonstrable injury or allege that he complained about the handcuffs causing him pain and was ignored, the Court dismisses his claim of excessive force. *See also Thomas v. Cassia Cty., Idaho*, No. 4:17-CV-00256-DCN, 2019 WL 938385, at *8 n.6 (D. Idaho Feb. 26, 2019), *adhered to on reconsideration*, No. 4:17-CV-00256-DCN, 2019 WL 5270200 (D. Idaho Oct. 17, 2019) ("The Court's decision to grant summary judgment is further supported by [plaintiff's] failure to produce any medical documentation that proves his claimed injuries."); *Law v. City of Post Falls*, 772 F. Supp. 2d 1283, 1300 (D. Idaho 2011) ("Furthermore, like the plaintiff in *Arpin*, in this case Plaintiff has not produced any medical evidence in response to Defendants' motion for summary judgment that the handcuffing resulting in damage to his wrists or hands.").

*3. False Arrest*

Tanner alleges in his Amended Complaint that Defendant Cowell "false[ly] arrest[ed]" him. Dkt. 4, at ¶ 76.

IDFG officers had already arrested Tanner prior to Cowell arriving on the scene. Cowell assisted the IDFG officers but never independently arrested Tanner. Cowell reiterated during oral arguments that he never issued any citation to Tanner, whether relating to DUI, obstruction, or otherwise. Tanner has not provided any evidence that Cowell arrested him or cited him for any offense.

As Tanner was only arrested once on November 17, 2017—and the arrest occurred prior to Cowell arriving on the scene—the Court finds that Cowell did not participate in a "false arrest" of Tanner.

### 4. *Fifth Amendment: Right to Remain Silent*

Cowell asserts that "the Fifth Amendment applies only to the acts of the federal government and therefore [Tanner's claim in this respect] must be dismissed against" him. Dkt. 72-1, at 12; Dkt. 89, at 7 (citing *Spies v. People of the State of Illinois*, 123 U.S. 131, (1887)).

While technically correct, the Court emphatically disagrees with Cowell's argument. The Fifth Amendment privilege of the right to remain silent is secured against state officers through the Fourteenth Amendment. *Malloy v. Hogan*, 378 U.S. 1, 8 (1964) ("The Fourteenth Amendment secures against state invasion the same privilege that the Fifth Amendment guarantees against federal infringement—the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty, as held in Twining, for such silence."). Tanner, as a *pro se* plaintiff, may have unartfully articulated that he was bringing his Fifth Amendment claim against state officers through the Fourteenth Amendment, but his intent was clear. The Court will construe his claim as such.

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. "Where the initial request to stop the questioning is clear, 'the police may not create ambiguity in a defendant's desire by continuing to question him or her about it.'" *Anderson v. Terhune*, 516 F.3d 781, 790

(9th Cir. 2008) (quoting *Barrett,* 479 U.S. at 535 n. 5, 107 (Brennan, J., concurring)).

Where the police "parse[ an arrestee's] invocation into specific subjects, 'the police fail[] to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind.'" *Id*. (quoting *Mosley,* 423 U.S. 96, 105–06 (1975)). The net result is that "such follow-up questions allow the officer to avoid honoring the Fifth Amendment and, as in a right to counsel situation, enable[] 'the authorities through 'badger[ing]' or 'overreaching'—explicit or subtle, deliberate or unintentional—[to] wear down the accused and persuade him to incriminate himself.'" *Id*. (quoting *Smith v. Illinois*, 469 U.S. 91, 98 (1984)).

However, the Supreme Court held, in a fractured opinion, that coercive police questioning does not violate a suspect's Fifth Amendment right against compelled self-incrimination unless and until the compelled statement is "used" against the suspect in a "criminal case." *Chavez v. Martinez,* 538 U.S. 760, 766 (2003) (Thomas, J., joined by Rehnquist, C.J., O'Connor, J., and Scalia, J.); *id*. at 777–78 (Souter, J., joined by Breyer, J.). Applying *Chavez*, the Ninth Circuit has held that a statement has been "used in a criminal case" if government officials relied on the incriminating statement "to initiate or prove a criminal charge." *Stoot v. City of Everett*, 582 F.3d 910, 925 n.15 (recognizing that plaintiff's Fifth Amendment rights were not violated until the prosecutor used his coerced statements in an affidavit and at arraignment).

Here, Tanner fails to allege which, if any, of his statements were used to initiate or prove a criminal charge. He alleges that Cowell arrested him for drunk driving and

obstructing an officer as punishment for asserting his right to remain silent. As stated previously, Tanner has provided no evidence that he was arrested by Cowell at all, let alone for those two charges. Additionally, there is no record illustrating that any statements Tanner made to Cowell, or other officers, that night were used against him in any criminal proceeding.[13] Absent such evidence, the Court holds Tanner's Fifth Amendment right against compelled self-incrimination was not violated—despite Cowell's failure to honor a decision of a person in custody to cut off questioning. As there is no constitutional violation, the Court dismisses Tanner's Fifth Amendment claim under § 1983 against Cowell.

*5. Conclusion*

The Court finds Cowell did not violate Tanner's constitutional rights. Thus, it does not review Cowell's qualified immunity claims prior to dismissing Tanner's § 1983 against Cowell.

**6. Tanner's Fourth Cause of Action**

Tanner's fourth cause of action is for declaratory judgment and injunctive relief. He seeks to enjoin Defendants from operating wildlife checkpoint roadblocks and to mandate that Defendants only stop fishermen, hunters, and trappers at wildlife check stations, rather than the public at large. As the Court has already held that the routine IDFG wildlife checkpoint roadblocks which briefly stop the public for the purpose to effectively manage

---

[13] The prosecutor dismissed the two counts (failing to stop and report at a check station and eluding a police office) brought by the State of Idaho against Tanner at his pre-trial conference. Dkt 85-14, Transcript of January 11, 2018, Pretrial Conference, at 48.

the state's wildlife resources are both constitutional and statutorily authorized, such relief would be inappropriate. The Court dismisses Tanner's Fourth Cause of Action.

### 7. Tanner's Motion to Strike

During oral arguments, Tanner moved to strike Cowell's affidavit on the grounds that Cowell lacked personal knowledge of events that occurred prior to his arrival at the gas station. Specifically, Tanner argues that Cowell cannot testify to the events that occurred at the wildlife check point.

The Court has reviewed Cowell's affidavit. Dkt. 72-4. In it, Cowell testifies that he overheard a radio call from the Boundary County Communication Police Dispatch ("dispatch") that a driver had failed to yield. *Id*. ¶ 6. He further testifies that Officer Swanson was the individual who advised dispatch that the driver refused to pull over, despite the fact that the pursuing officer's vehicle had its lights and sirens activated. Based on the information from dispatch, he determined it was a "high risk" situation. *Id*. ¶ 7.

Cowell is not testifying as to the truth of what dispatch or Officer Swanson asserted. Rather, he is providing foundation for his own opinion. In other words, what Tanner alleges are *facts* asserted are actually part of Cowell's *opinion*. The Court will give Cowell's opinion the weight it deems appropriate. The Court denies Tanner's motion to strike.[14]

---

[14] The Court notes that it did not rely on Cowell's affidavit concerning the events that occurred prior to his arrival on the scene in determining whether to grant Defendants' Motions for Summary Judgment.

MEMORANDUM DECISION AND ORDER - 38

## V. ORDER

The Court HEREBY ORDERS:

1. Defendant Cowell's Motion for Summary Judgment (Dkt. 72) is **GRANTED**.

2. IDFG Defendants' Motion for Summary Judgment (Dkt. 73) is **GRANTED**.

3. This case is dismissed in its entirety and closed.

4. The Court will enter a separate judgment in accordance with Federal Rule of Civil Procedure 58.

DATED: September 9, 2020

David C. Nye
Chief U.S. District Court Judge